270 N.J. Super. 429 (1994)
637 A.2d 532
STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v.
L.J.P., SR., DEFENDANT-APPELLANT.
Superior Court of New Jersey, Appellate Division.
Argued November 15, 1993.
Decided January 14, 1994.
*431 Before Judges PETRELLA, CONLEY and VILLANUEVA.
Robert L. Sloan, Assistant Deputy Public Defender, argued the cause for appellant (Zulima V. Farber, Public Defender, attorney; Mr. Sloan, of counsel and on the brief).
*432 Teresa B. Blair, Deputy Attorney General, argued the cause for respondent (Fred DeVesa, Acting Attorney General of New Jersey, attorney; Ms. Blair, of counsel and on the letter brief).
The opinion of the court was delivered by VILLANUEVA, J.A.D.
Defendant appeals from his conviction of two counts of first degree aggravated sexual assault, a third count of second degree sexual assault and a fourth count of third degree endangering the welfare of a child. We reverse.
An indictment was filed in Burlington County charging defendant and co-defendant E.S.[1] with two counts of first degree aggravated sexual assault, N.J.S.A. 2C:14-2a(1); second degree sexual assault, N.J.S.A. 2C:14-2b, and third degree endangering the welfare of a child, N.J.S.A. 2C:24-4a.
On April 26, 1991, the trial judge ordered that the records of the Division of Youth and Family Services (DYFS) concerning J.B., the victim, be submitted to the court for in camera review. The judge thereafter released copies of the psychologist's reports to the prosecutor and defense counsel. The judge heard pre-trial motions regarding the psychologist-patient privilege and testimony relating to the DYFS records, admissibility of similar prior convictions for impeachment purposes and other matters. The judge denied defendant's request to allow evidence that the victim recanted to a psychologist with whom she had met at the request of DYFS. The judge also ruled that similar prior convictions of both defendant and defendant's wife were admissible for impeachment purposes if either testified.
At trial, the State's evidence indicated that J.B., who was born on June 13, 1978, was living with her mother in 1988 in a Burlington Township apartment. Her father and two brothers *433 had moved to another residence. After brief stays in two separate foster homes over a period of four months, J.B. stayed with her father and brothers until Labor Day weekend, in September 1989, when she returned to live with her mother in another Burlington apartment. Defendant, who married J.B.'s mother approximately two weeks thereafter, also lived there.
After the marriage, defendant and J.B. had a father/daughter relationship. According to J.B., within one or two months of the marriage, when they were alone in the apartment, defendant began to touch her inappropriately in the breast and vaginal area, first through her clothing and later underneath it. At that time, J.B. never told anyone because she "just never thought about it [telling someone]." J.B. also stated that she didn't know how she felt about defendant's conduct but wasn't scared at first.
J.B. related a specific incident that occurred in October 1989, involving defendant and E.S. On direct examination, J.B. testified that both men touched her. Later, J.B. stated that she remembered E.S. touching her breasts but did not remember if defendant touched her that day. That particular day was not clear to her, but she testified that defendant had touched her vaginal area and put his finger in her vagina more than once; she just did not "remember the exact dates."
E.S. testified and admitted to rubbing J.B.'s breasts on that occasion. He also testified that he saw defendant rubbing J.B.'s "buttock area underneath her clothes" and then "noticed his hand go underneath between her legs...." When first questioned by police, E.S. denied that anything happened. But, after being offered a plea agreement with a possibility of probation, he pleaded guilty and agreed to testify at defendant's trial. In his formal police statement, where he admitted touching J.B., E.S. said that he had not seen defendant put his hands under her clothing.
J.B. also testified about other incidents including one in which defendant told her to perform fellatio on him and he ejaculated in her mouth. J.B. stated that she did not tell anyone because she *434 was scared because at that time defendant had told her that if she "told anyone, he would get [her] pregnant."
J.B. also testified about two incidents of sexual intercourse with defendant. J.B. admitted having consensual sexual relations with R.D., a seventeen year-old friend of defendant, in August 1990, in the kitchen of the apartment when her mother was asleep in her room with the door shut and defendant was in the living room. J.B. testified that later the same evening defendant came into her room while she was in bed and "pulled [her] panties off" and had sexual intercourse with her and she thought "he  it was [R.D.] until he had left." She further stated: "I didn't know that it was [defendant] at the time until he had left and when he left, he said, you thought I was [R.D.], didn't you?"
J.B. testified that there was a second incident of sexual intercourse with defendant but she did not remember when or what happened. Asked about subsequent incidents of intercourse with defendant, J.B. indicated that he had once approached her as she emerged from the bathroom. After forcing her to the floor and removing her clothes, he made her perform fellatio.
J.B. never reported these incidents to her mother or her friends. It appears from J.B.'s testimony that friends unsuccessfully questioned her about defendant and the friends' suspicions were ultimately conveyed to J.B.'s mother. J.B. was taken to a hospital, where she was examined by doctors and also spoke to the police to whom she gave a taped statement.
Afterwards, she went to stay with her aunt and uncle, defendant's sister and brother-in-law, for about one month. While staying there, J.B. wrote a letter dated September 14, 1990, to a judge stating that the whole story was a lie. At trial, she stated that she copied the letter from one that her uncle wrote for her. J.B. testified that her trial testimony was the truth. On cross-examination, J.B. read the letter aloud,
Dear Judge, I am writing this letter to tell you I am very sorry for causing a big problem, lying about things that my stepfather had done to me. My stepfather did *435 not ever have any sex with me at any time. I am very sorry about saying this. I don't know why I did this. I hope you will forgive me. Thank you.
On cross-examination, she stated that she wrote the letter because she wanted a decent family that would include defendant: "All I wanted was like a mom and a dad ... I was just going to give him a second chance." J.B. denied that she and defendant argued about her having boyfriends at the age of twelve but did admit that sometimes he was strict with her.
Called by the defense, Detective Bittner testified that he met with J.B. three times and ultimately J.B.'s mother and uncle told him that J.B. had made the whole story up.
The defense also called J.B.'s uncle, the defendant's brother-in-law, who testified that J.B. came to him "kind of crying" and said "Uncle Bill, I've been lying about everything, I'm sorry." He stated that she said she lied because her mother was not giving her enough attention and she was mad at defendant for punishing her. J.B.'s uncle stated that he and his wife then took J.B. to the police station to see Detective Bittner, along with J.B.'s mother. After he told the detective what J.B. had said to him, he said the detective took J.B. somewhere for about ten to fifteen minutes. He also said that before the detective took her to another room he asked her in front of the others if what her uncle said was true and she said "yes."
J.B.'s uncle also testified that the detective told him that he did not believe J.B. was now telling the truth. J.B.'s uncle therefore consulted a lawyer who advised him to write a letter and "have it signed and notarized." He drafted a letter but after being informed by the lawyer that J.B. should write it in her own words, he had J.B. herself write a second letter and took her to a notary to have it signed by the notary.
Defendant did not testify. The jury found defendant guilty of all four charges. Defendant's motion for acquittal and for a new trial were denied. Defendant was sentenced to serve two concurrent twenty-year terms of imprisonment at the Avenel Adult Diagnostic and Treatment Center, each with a five-year mandatory *436 minimum before parole eligibility pursuant to N.J.S.A. 2C:14-6 because it was a second sexual offense. The sexual assault conviction was merged. A concurrent five-year custodial term was imposed for endangering the welfare of a child. An aggregate V.C.C.B. penalty of $90 was assessed.
On appeal, defendant argues:
POINT I THE EMPLOYMENT OF THE PSYCHOLOGIST-PATIENT PRIVILEGE TO PREVENT INTRODUCTION OF EVIDENCE OF RECANTATION BY THE VICTIM DEPRIVED DEFENDANT OF THE RIGHT TO CONFRONT WITNESSES, THE RIGHT TO COMPULSORY PROCESS, THE RIGHT TO DUE PROCESS OF LAW, AND THE RIGHT TO A FAIR TRIAL. U.S. CONST. AMENDS. V, VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10.
POINT II THE PRETRIAL RULING THAT THE TESTIMONY OF THE DEFENDANT AND A WITNESS COULD BE IMPEACHED WITH PRIOR CRIMINAL CONVICTIONS VIOLATED DEFENDANT'S RIGHT TO DUE PROCESS OF LAW AND A FAIR TRIAL. U.S. CONST. AMENDS V, VI, XIV; N.J. CONST. (1947) ART. I, PARS. 1, 9, 10.

I.
In a pretrial ruling, the trial judge concluded that the psychologist-patient privilege precluded defendant from introducing evidence, contained in reports already in the defendant's possession, that J.B. had recanted her allegations of sexual abuse against him during a conversation with her psychologist.[2]
At a conference immediately prior to the trial, defense counsel explained that the DYFS file, which had been given to another judge for in camera review and then inspected by both counsel, contained the report of a psychologist, Dr. Martin Richter, from which the jury might conclude that the victim indicated that she had fabricated the charges against defendant. Defense counsel's position was that the psychologist-patient privilege should not apply in such circumstances to prevent the use of the report and the testimony of Dr. Richter, who had been subpoenaed. Relying on the statutory privilege, the prosecutor urged that Dr. Richter *437 "be precluded from testifying as to anything that she has told him in these sessions that she's had."
The records included Dr. Richter's evaluation reports dated March 19, 1990 and September 14, 1990. In the latter report, Dr. Richter referred to J.B.'s retraction of her allegation of molestation by defendant in a letter to a judge and then continued:
[W]hen asked why she alleged her stepfather was molesting her, she stated that she wanted to get closer to her mother. She indicated she had been punished for two weeks and she was mad at [defendant] for it. She stated she had been having trouble with her stepfather because she had been going with some black boys and he refused to allow this to continue.
Defense counsel urged that he was entitled to establish not only that J.B. never reported defendant's alleged acts to Dr. Richter during the period of counselling but also that she specifically recanted the charges previously made.
In ruling that Dr. Richter's reports could not be used at trial, the judge reasoned that the psychologist-patient privilege is especially important because of the involvement of "thought processes and personal thoughts" as opposed to the more mundane conversation arising from the physician-patient relationship. Although a trial is a search for the truth, privileges recognize "that there are some values in society which are more important than the truth or the whole truth in certain circumstances." Concerning "negative fresh complaint," the judge observed that J.B. might be dealing with Dr. Richter for particular problems and was not "necessarily bearing [sic] her entire soul."
With respect to the report's reference to J.B.'s making allegations against defendant out of anger over discipline, the judge recognized that this information was potentially significant but felt the jurors "can decide whether the original story was true or the recantation happened or whether it was true or whether she's flipping back and forth and who's asserting pressure on who, when and how."
While recognizing that the psychologist-patient privilege may be overcome in certain circumstances, the judge balanced "the interest *438 in confidentiality and the interests of a search for the truth" and found no "sufficiently compelling reason" to set aside the privilege. The judge would not permit Dr. Richter to testify concerning the contents of his reports or J.B.'s failure to complain about defendant.
Turning to the issue of waiver, defense counsel argued that J.B. "would have waived her psychologist/patient privilege by proceeding with these charges and also that the privilege may have been waived when it was disseminated to DYFS." The judge properly rejected the waiver argument.
The psychologist-patient privilege was established in 1966 by N.J.S.A. 45:14B-28:
The confidential relations and communications between and among a licensed practicing psychologist and individuals, couples, families or groups in the course of the practice of psychology are placed on the same basis as those provided between attorney and client, and nothing in this act shall be construed to require any such privileged communications to be disclosed by any such person.
Although this privilege was not among the Rules of Evidence when this case was tried, it has been included, in the identical form, as N.J.R.E. 505, effective July 1, 1993.
The psychologist-patient privilege was created by the New Jersey legislature as a "part of a comprehensive statutory scheme designed to license and regulate practicing psychologists." Arena v. Saphier, 201 N.J. Super. 79, 85, 492 A.2d 1020 (App.Div. 1985). The privilege was created two years before the codification of the common law physician-patient privilege in 1968. Ibid; see also Lazorick v. Brown, 195 N.J. Super. 444, 451-52, 480 A.2d 223 (App.Div. 1984) (detailing the legislative history of the physician-patient privilege). Those two privileges are not treated alike by the courts and are not subject to the same exceptions. Arena, supra, 201 N.J. Super. at 85-86, 492 A.2d 1020. Rather, the psychologist-patient privilege is akin to the attorney-client privilege. N.J.S.A. 45:14B-28; State v. McBride, 213 N.J. Super. 255, 269-70, 517 A.2d 152 (App.Div. 1986); Arena, supra, 201 N.J. Super. at 87, 492 A.2d 1020. The privilege belongs to the patient and any waiver of the privilege must be made by the patient. State in *439 Interest of L.P., 250 N.J. Super. 103, 112, 593 A.2d 393 (Ch.Div. 1991).
The privilege is given greater scope and protection than the physician-patient privilege. McBride, supra, 213 N.J. Super. at 270, 517 A.2d 152; Arena, supra, 201 N.J. Super. at 86, 492 A.2d 1020. "The nature of the psychotherapeutic process is such that full disclosure to the therapist of the patient's most intimate emotions, fears and fantasies is required." Id. at 86, 492 A.2d 1020.
However, the privilege, like the attorney-client privilege, is not absolute. "Although the psychologist-patient privilege affords even greater confidentiality than the physician-patient privilege, it still may be defeated where `common notions of fairness clearly compel at least limited disclosure of otherwise confidential communications.'" McBride, supra, 213 N.J. Super. at 270, 517 A.2d 152 (quoting Arena, supra, 201 N.J. Super. at 89, 492 A.2d 1020). "Like other privileges, it must in some circumstances yield to the higher demands of order." Matter of Nackson, 114 N.J. 527, 537, 555 A.2d 1101 (1989) (referring to the attorney-client privilege). Such demands may include a defendant's right to a fair trial. Id. However, the requisite foundation for piercing the privilege involves a showing of legitimate need for the shielded evidence, its materiality to a trial issue, and its unavailability from less intrusive sources. Id.; (quoting, In re Kozlov, 79 N.J. 232, 243-44, 398 A.2d 882 (1979)). For example, if the patient discloses emotional or mental problems by filing an action in which those problems are at issue, at least limited disclosure is warranted despite the privilege. Arena, supra, 201 N.J. Super. at 89, 492 A.2d 1020. The patient/litigant cannot be permitted to use the privilege as a "sword" rather than merely a "shield." Id. at 88, 492 A.2d 1020 (quoting United Jersey Bank v. Wolosoff, 196 N.J. Super. 553, 567, 483 A.2d 821 (App.Div. 1984)).
We have noted that the Sixth Amendment and the State constitution might even require the release of a psychological *440 report to a defendant after an in camera review by a judge. McBride, supra, 213 N.J. Super. at 270, 517 A.2d 152. The privilege may also be pierced, as can the attorney-client privilege, under other circumstance such as, where: 1) there is a legitimate need to disclose the protected information; 2) the information is relevant and material to the issue before the court; and, 3) the party seeking to pierce the privilege shows by a "preponderance of the evidence" that "no less intrusive source" for that information exists. United Jersey Bank v. Wolosoff, supra, 196 N.J. Super. at 563-64, 483 A.2d 821; see also Arena, supra, 201 N.J. Super. at 88, 492 A.2d 1020.
Because the invocation of privileges results in the loss of relevant evidence, "courts here and elsewhere have long construed them narrowly in an attempt to promote, at once, the goals of the privilege and the truthseeking role of the courts." State v. Schreiber, 122 N.J. 579, 582-83, 585 A.2d 945 (1991) (holding statutory physician-patient privilege inapplicable to drunk-driving prosecution); see also State v. Dyal, 97 N.J. 229, 237, 478 A.2d 390 (1984) (declaring that physician-patient privilege must be restrictively interpreted); State v. Allen, 70 N.J. 474, 484-86, 361 A.2d 5 (1976) (holding that the confidentiality of juvenile records had to yield to the extent required to resolve the issue of an important witness' competency); State v. Briley, 53 N.J. 498, 506-07, 251 A.2d 442 (1969) (ruling that marital privilege should be narrowly construed when spouse is the sole victim). As we recently observed, "we think it important when considering the scope of various privileges to recognize that privileges preventing disclosure of relevant evidence are not favored and may often give way to a strong public interest." State v. Szemple, 263 N.J. Super. 98, 101-02, 622 A.2d 248 (App.Div. 1993), leave to appeal granted, ___ N.J. ___ (1993) (construing priest-penitent privilege narrowly).
In a case distinguishable from the facts involved herein, we found that the trial court had properly conducted in camera review of DYFS records and concluded that the information was not essential to any issue in the sexual abuse trial and was also *441 available elsewhere. State v. Cusick, 219 N.J. Super. 452, 465, 530 A.2d 806 (App.Div.), certif. denied, 109 N.J. 54, 532 A.2d 1118 (1987). We, therefore, upheld the refusal to disclose them to the defense. Ibid. Because the materials "could not have been used in any manner to impeach the testimony of the State's witnesses," the interests in confidentiality outweighed the defendant's interest in disclosure. Ibid.
A trial court decision overriding the psychotherapist-patient privilege was upheld in In re Doe, 964 F.2d 1325 (2d Cir.1992), where the complaining witness in an extortion case was held in contempt for refusing to answer questions about his psychiatric history during a pretrial in camera hearing. In view of the witness's importance and the effect of his psychiatric history on his credibility, preclusion of the inquiry because of the privilege would violate the confrontation clause. Id. at 1328-29. "[T]he balance in this case weighs overwhelmingly in favor of allowing an inquiry into his history of mental illness." Id. at 1329.
In State v. McBride, supra, we explained the rationale of the privilege as follows:
We see an inherent unfairness for the complaining witness to impose the stricture of confidentiality upon a psychologist or physician, thus preventing a defendant from reaching an item of evidence which a judge determines after a review of all relevant factors to the [sic] potentially exculpatory. The trial court effectively permitted the victim's uncorroborated tale of the events in question to stand unrebutted where there may have been a foundation for other causes of her mental disorder, thus affecting both her and [the medical expert's] credibility.

[213 N.J. Super. at 271, 517 A.2d 152.]
Accordingly, we remanded for in camera review of the reports to determine if the use at trial could have affected the outcome. Id. at 271-72, 517 A.2d 152.
Herein, under the balancing test of Nackson, defendant established that he had a legitimate need for material evidence in the form of recantation statements made by J.B. to a psychologist. With respect to piercing the privilege, the only serious issue was the unavailability of the information from other sources.
*442 The State argues that the testimony produced by defense and elicited from J.B. on cross-examination provided less intrusive sources for impeachment and the psychologist's report did not include unequivocal evidence that the allegations were false, only the reasons prompting the victim to come forward with the allegations. Therefore, the State argues that the psychologist's interpretations and conclusions may offer exculpatory evidence but the testimony produced by defense counsel allows the jury to reach similar conclusions. However, this conclusion is an issue for the jury to determine.
Although, as the trial judge observed, other evidence of recantation was available to the defense and was, in fact, introduced at trial, this was not dispositive. In her testimony, J.B. dismissed her recantation as the product of coercion and misguided hopes for a reunited family. Under the judge's ruling, the defense was unable to rebut this testimony with evidence of recantation under circumstances when J.B. was not subject to pressure from defendant's family. Accordingly, the evidence at issue was not otherwise available to the defense.
Although a witness testified to J.B.'s recantation and maintained that she had initiated it and freely discussed it, the defense was entitled to introduce all of its impeachment evidence. Because J.B. repudiated her separate recantation to defendant's family members as the product of duress and misguided judgment, her recantation under other circumstances was critical impeachment evidence. Since J.B.'s recantation to the psychologist was significant evidence, it was not merely cumulative, and its exclusion was not harmless error.
Relying on the critical right of a criminal defendant to cross-examine and present witnesses, the United States Supreme Court has held that the strict application of rules of evidence could not, as a matter of fundamental fairness, prevent the eliciting of reliable exculpatory evidence from a witness who had admitted committing the crime himself but subsequently recanted his confession. Chambers v. Mississippi, 410 U.S. 284, 302, 93 S.Ct. *443 1038, 1049, 35 L.Ed.2d 297, 312-13 (1973). Similar considerations underlie the uniform refusal, under Davis. v. Alaska, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974), and its progeny, to permit privileges to undermine the right of a defendant to present evidence to impeach critical witnesses.
The defendant's legitimate need for critical evidence and his right to confront his accuser with her repudiation of her allegations was far more compelling than the interests in confidentiality.

II.
Lastly, defendant contends that the trial judge committed reversible error in ruling that his 1988 conviction for two counts sexual assault and his wife's 1986 conviction for child endangerment would be admissible at trial to affect their credibility should either choose to testify. Specifically, defendant argues that these convictions should have been excluded on Evid.R. 4 (now N.J.R.E. 403) grounds because of their similarity to the present charges, and their lack of relevance to veracity.
At the time of this trial, defendant's prior convictions were properly held admissible for impeachment purposes under State v. Sands, 76 N.J. 127, 386 A.2d 378 (1978). However, after this trial, the Supreme Court decided State v. Brunson, 132 N.J. 377, 625 A.2d 1085 (1993), where it modified Sands prospectively to require that defendant's prior convictions be "sanitized."
[I]n those cases in which a testifying defendant previously has been convicted of a crime that is the same or similar to the offense charged, the State may introduce evidence of the defendant's prior conviction limited to the degree of the crime and the date of the offense but excluding any evidence of the specific crime of which defendant was convicted.

[Id. 76 N.J. at 391, 386 A.2d 378].
However, on retrial, the trial judge should be guided by the criteria set forth in Brunson.
Likewise, the judge properly ruled that defendant's wife's prior conviction could be used to affect her credibility if she had *444 testified. See State v. Balthrop, 92 N.J. 542, 546, 457 A.2d 1152 (1983); State v. Harkins, 177 N.J. Super. 397, 401, 426 A.2d 1053 (App.Div. 1981) (ruling that N.J.S.A. 2A:81-12, which deems prior convictions admissible for impeachment, applies to all witnesses in a trial, not just to criminal defendants).
Reversed and remanded for a new trial consistent with this opinion.
NOTES
[1] E.S. pled guilty and testified for the State. Therefore, defendant is the only party to this appeal.
[2] A motion for a new trial, based on this pretrial ruling, was also denied.