730 A.2d 881 (1999)
Diane RUNYON, Plaintiff/Appellant,
v.
Maureen B. SMITH, Ph.D., and Psychological Associates, Defendants/Respondents.
Superior Court of New Jersey, Appellate Division.
Submitted February 3, 1999.
Decided June 15, 1999.
*882 Charles J. Lange, for plaintiff-appellant.
Harwood Lloyd, Hackensack, for defendants-respondents (John R. Gonzo, of counsel and on the brief).
Before Judges KING, WALLACE and FALL.
The opinion of the court was delivered by WALLACE, J.A.D.
In this action for money damages for breach of the psychologist-patient privilege, plaintiff Diane Runyon appeals from the grant of summary judgment in favor of defendants, Maureen B. Smith, Ph.D. and Psychological Associates, dismissing her complaint. We reverse.
The essential facts are not disputed. On January 30, 1995, plaintiff sought and obtained a temporary restraining order under N.J.S.A. 2C:25-28 of the Prevention of Domestic Violence Act, N.J.S.A. 2C:25-17 to -33, prohibiting her husband Guy Runyon from returning to the marital home. Mr. Runyon sought an immediate hearing on January 31, 1995 to contest the TRO because he believed plaintiff was a danger to the children. The record is silent whether plaintiff received notice of the January hearing, but she did not appear at the hearing. Prior to receiving any evidence at the January hearing, the trial *883 judge observed that plaintiff was not present and inquired if she had received notice. Counsel for Mr. Runyon replied that plaintiff was at the Saddle River Police Department when he called there, and he told the Sergeant he would be going to the courthouse to file an application for an immediate hearing. The judge again inquired what efforts were made to give plaintiff notice of the hearing and counsel replied:
The housekeeper is here, [she] indicates that [plaintiff] said that she was taking the children and might or might not be home later. I might say for the record that [plaintiff], having full knowledge of what was going on here, made no effort to reach out for me.
The judge then proceeded to receive testimony without any further effort to obtain plaintiff's appearance at the January hearing.
Mr. Runyon called defendant, Maureen B. Smith, a licensed clinical psychologist in New York, as his first witness. Dr. Smith testified she started treating plaintiff about five years previously and later counseled both plaintiff and Mr. Runyon. She had last treated plaintiff approximately six months ago. When asked to express her concern about the children, Dr. Smith replied:
I'm concerned about their welfare and their safety at this point. The mother does not have a history of a good relationship with them and for the most part, particularly the last two years has been pretty much an absentee mother.
The children have a close relationship with their father. He's the primary parent.
Diane also has a history of being physically and verbally abusive with David, the oldest boy, and there's a stormy relationship there.
My concern at this point, I've lost contact with Diane. She became involved init's almost ait's a psychic group ormy impression is it could be cult like.
She's an obsessive compulsive personality who when she becomes involved with something really takes it sometimes too far and she tends to be impulsive. I don't knowit's a big question mark in my mindreally, would she bring these children to the people she associates with? I really don't know.
And I see her at this moment just struggling with David physically because these kids just don't know what has happened.
The next witness was Reba Carol Drexler, a close fiend of plaintiff. She testified that plaintiff had a very stormy relationship with the children and had taken long absences from them. Drexler explained that Mr. Runyon enjoyed an excellent relationship with the children and was the primary caretaker. In her view, it would be in the best interest of the children to be with him.
The final witness was Mr. Runyon. He denied threatening plaintiff or trying to take the children away from her. He also described his daily activities with the children which included helping them get ready for school, preparing their meals and coaching them in sports. In response to a question regarding the welfare of the children when the children are with plaintiff, Mr. Runyon stated that plaintiff often screams and pushes their eldest son, David. Further, he said that plaintiff, commits three to four acts of physical violence on David every week and David is afraid of her. Mr. Runyon feared that plaintiff may harm the children.
The Family Part judge found Dr. Smith's testimony "very persuasive," and modified the temporary restraining order by granting temporary custody of the children to Mr. Runyon and directing the police to accompany plaintiff to the marital home where she could gather her belongings.
Subsequent to the January hearing, Dr. Smith submitted a written report dated June 19, 1995 to the court, wherein she was again critical of plaintiff. Dr. Smith concluded in her report that "it would be an enormous mistake" to expose the children *884 to "the ideology of a woman with obvious thought disorders. [Plaintiff] appears to be selfishly concerned with using the children to hurt her husband, rather than with what is best for them in these difficult times." Although the record of the custody hearing was not included in the record on appeal, plaintiff indicated in her brief that Dr. Smith's report was relied upon to severely restrict her access to her children and Mr. Runyon was awarded custody of the children.
On January 21, 1997, plaintiff filed a complaint for money damages against Dr. Smith and her employer, Psychological Associates. Plaintiff alleged that Dr. Smith violated the psychologist-patient privilege under N.J.S.A. 45:14B-28 and the rules and regulations governing psychologists and marriage counselors under N.J.S.A. 45:8B-29 by providing fact and opinion testimony at the January 31, 1995 hearing based on information learned from counseling sessions with plaintiff. Further, plaintiff alleged that Dr. Smith submitted a written report and certification that contained false information.
After filing an answer to the complaint, defendants moved for summary judgment. Defendant also included a copy of Dr. Smith's June 19, 1995 report which she had previously submitted to the Family Part judge. Defendants acknowledged that Dr. Smith testified adversely to plaintiff at the January hearing but claimed her testimony was required in the best interests of the children. Plaintiff cross-moved for summary judgment. In addition to her main argument that Dr. Smith breached the psychologist-patient privilege, plaintiff argued that even if Dr. Smith was entitled to breach the privilege, she had no immunity to make false and inaccurate statements and that defendants' motion for summary judgment did not address their liability for Dr. Smith's false and inaccurate testimony. As noted, the motion judge granted defendants' motion. However, the judge agreed to refrain from entering final judgment until the parties made further argument regarding the limits of the summary judgment order at a telephone conference to be held later that day. At the conference, plaintiff's counsel argued that the order for summary judgment in favor of defendants should be limited to plaintiff's claims of professional negligence and should not include plaintiff's claim that Dr. Smith was liable to plaintiff for false and inaccurate testimony. The judge agreed not to decide that issue and entered judgment denying plaintiff's cross-motion for summary judgment and granting partial summary judgment in favor of defendants.
In August 1997, defendants filed a second motion for summary judgment. Defendants argued that false and inaccurate testimony by a witness at a judicial or quasi-judicial proceeding was immunized from any civil liability. The motion judge agreed and on October 10, 1997, granted summary judgment in favor of defendants dismissing plaintiff's remaining claims with prejudice. This appeal followed.
Plaintiff essentially contends Dr. Smith was not entitled to breach either the psychologist-patient privilege or the marriage counselor-client privilege because the scope of the January hearing did not concern custody or a determination of parenthood. Moreover, plaintiff contends the hearing judge failed to determine whether Dr. Smith could testify about confidential information prior to her testimony. Defendants do not deny that Dr. Smith breached both privileges, but instead argue she was entitled to do so to promote the best interests of the children.
The relevant text and rule for the psychologist-patient privilege provides:
The confidential relations and communications between and among a licensed practicing psychologist and individuals, couples, families or groups in the course of the practice of psychology are placed on the same basis as those provided between attorney and client, and nothing in this act shall be construed to require any such privileged communications to be disclosed by any such person.

[N.J.S.A. 45:14B-28 and N.J.R.E. 505 (emphasis added).]
*885 The relevant text and rule for the marriage and family therapist privilege provides:
A communication between a marriage and family therapist and the person or persons in therapy shall be confidential and its secrecy preserved. This privilege shall not be subject to waiver, except where the marriage and family therapist is a party defendant to a civil, criminal or disciplinary action arising from the therapy, in which case, the waiver shall be limited to that action.
[N.J.S.A. 45:8B-29 and N.J.R.E. 510.]
It is clear that the psychologist-patient privilege should be treated similarly to the lawyer-client privilege. Kinsella v. Kinsella, 150 N.J. 276, 297, 696 A.2d 556 (1997). "[T]he attorney-client privilege can be explained by a functional rationale 'the judicial recognition that the public is well served by sound legal counsel based on full and candid communication between attorneys and their clients.'" Id. at 298, 696 A.2d 556 (citing Fellerman v. Bradley, 99 N.J. 493, 502, 493 A.2d 1239 (1985)). Similarly, "the psychologist-patient privilege protects the individual from public revelation of innermost thoughts and feelings that were never meant to be heard beyond the walls of the therapist's office." Id. at 295, 696 A.2d 556.
It is also appropriate to look to the law regarding piercing of the lawyer-client privilege to help determine when it is appropriate to pierce the psychologist-patient privilege. The test to determine whether the lawyer-client privilege should be pierced was set forth in In re Kozlov, 79 N.J. 232, 398 A.2d 882 (1979). The Supreme Court established three prerequisites before a party may avoid the privilege. Kozlov, supra at 243-44, 398 A.2d 882. First, there must be a legitimate need for the evidence. Ibid. Second, the evidence must be relevant and material to the issue to be decided. Ibid. Third, the information sought cannot be secured from any less intrusive source. Ibid.
In Kinsella, the Court canvased the literature and the law regarding the psychologist-patient privilege. The Court noted exceptions to the psychologist-patient privilege where a party had effected a limited waiver of the privilege by placing his or her emotional and mental state in issue; where the privilege may be required to yield to the defendant's right to exculpatory evidence in a criminal proceeding; and where piercing of the privilege is required in the best interests of the children. Id. at 302-304, 696 A.2d 556. The Court also recognized the difficult problems in determining whether the psychologist-patient privilege should be pierced in custody determinations where the best interest of the child standard applies. Id. at 316, 696 A.2d 556. The Court relied heavily on the 1991 Task Force report of the American Psychiatric Association in explaining the approach the Family Part judge should follow in this area. In particular, the judge "must consider the mental health of the parents as well as the psychological well-being of the family as a whole." Id. at 327, 696 A.2d 556.
[B]y contesting custody or visitation, a parent does not automatically put information contained in records of therapy with such professionals `in issue.' In regard to therapy records, which are at the heart of the psychologist-patient privilege, the courts must strike a balance between the need to protect children who are in danger of abuse or neglect from unfit custodians and the compelling policy of facilitating the treatment of parents' psychological or emotional problems. Such a balance is in the best interest of the child.

[Ibid.]
The Court explained that the parties should first resort to the independent experts appointed by the courts or hired by the parties for the purpose of the litigation. Only if the information furnished by the independent experts is found to be inadequate "should the court consider piercing the psychologist-patient privilege *886 to compel disclosure of prior treatment records to the court and the parties." Id. at 328, 696 A.2d 556. In this regard the Court declared that:
[T]he decision to order such disclosure must be based on independent evidence of potential for harm to the child, for example, the fact of a recent hospitalization, the opinion of an expert, or the court's own observations. The court must also consider whether, based on the context of the prior treatment, the records are likely to contain relevant evidence, and whether such evidence is likely to be merely cumulative. Before releasing records to the parties, the court should conduct an in camera review, releasing only material that is relevant and material to the issues before it.

[Ibid.]
In short, "only in the most compelling circumstances should the courts permit the privilege to be pierced." Id. at 330, 696 A.2d 556.
Our decision in Arena v. Saphier, 201 N.J.Super. 79, 492 A.2d 1020 (App.Div. 1985), is also instructive. There we considered the scope of the psychologist-patient privilege in a medical malpractice action. At issue was whether the consultation notes of plaintiff's psychologist who treated her before and after the alleged medical malpractice were protected from pretrial disclosure by the provisions of N.J.S.A. 45:14B-28. We explained that the discoverability of the psychologist's consultation notes should be considered similar to the limited waiver doctrine applicable to the lawyer-client privilege. Id. at 88, 492 A.2d 1020. While recognizing the purpose of the psychologist-patient privilege is to preclude the humiliation of the patient and the exposure of his or her most intimate thoughts and emotions, we concluded that when the patient places mental or emotional problems at issue, fairness dictates at least limited disclosure of otherwise confidential communications. Id. at 89, 492 A.2d 1020. Nevertheless, we concluded that before the documents may be considered, they should be submitted to the trial judge for an in camera inspection to determine their relevance. Id. at 90, 492 A.2d 1020.
To be sure, in the present case the hearing judge did not have either the Appellate Division's or Supreme Court's decisions in Kinsella, since they were subsequently decided to the January hearing. However, even before Kinsella, the Court's holding in In re Kozlov and the view we expressed in Arena mandated that an in camera review take place before piercing of the privilege may occur.
Unfortunately, neither Dr. Smith nor the judge raised the issue of the psychologist-patient privilege at the January hearing. Surely Dr. Smith should have recognized that she was testifying to information she received in confidence, a clear violation of the psychologist-patient privilege. The patient holds the privilege and the psychologist may not waive it in the absence of approval by the patient or at the direction of the court. See State v. L.J.P., 270 N.J.Super. 429, 438, 637 A.2d 532 (App.Div.1994).
Thus, no attempt was made to apply the three-prong test of Kozlov to determine whether Dr. Smith's testimony was necessary. Further, no attempt was made to examine the other relevant evidence before resorting to Dr. Smith's testimony. As noted, a witness described as a friend of plaintiff testified against plaintiff's interest and stated that Mr. Runyon was the appropriate parent to have custody of the children. Quite naturally, the judge relied heavily on the testimony of Dr. Smith in awarding temporary custody of the children to Mr. Runyon. That is to be expected since Dr. Smith was plaintiff's psychologist and testified adversely to her client. However, even in the absence of Dr. Smith's testimony, there was sufficient evidence from plaintiff's friend and from Mr. Runyon to justify awarding temporary custody of the children to Mr. Runyon. Thus, the third and crucial prong of Kozlov, that the information sought cannot be secured from a less intrusive source, was not satisfied.
*887 More importantly, even if Dr. Smith's testimony could somehow be justified at the January hearing, there is no reasonable explanation for the submission by Dr. Smith of her June 19, 1995 report to counsel and the trial court in opposition to plaintiff's attempt to obtain custody and greater visitation. Dr. Smith not only described confidential information concerning the plaintiff, she was critical of the reports of other experts. In discussing the reports of Dr. Schreiber and Dr. Grief and visitation issues, Dr. Smith submitted:
Dr. Schreiber's report is very general and eludes [sic] to certain abnormal scoring that I would like more information on. I would like to see the results (including protocol) of the MMP12. Dr. Schreiber indicates that [plaintiff] might have made a conscious distortion to project herself in a more favorable light. I would like to get more information as to this statement and to the total profile. I am also curious as to the details of the reference made, to the below clinical significance results of the test designed specifically for individuals who demonstrate psychotic thought processes. Even though he claims the profile was within normal limits, he does not give a detailed description or diagnosis, nor does he show how the different sub-tests relate to each other. Example, how does he relate a mild elevation on the O-H scale to other sub-test scores?
Dr. Grief was only able to see the manipulating "frightened sweet little girl," but did not see the hysterical, out of control personality which better illustrates a thought disorder. I have seen [plaintiff] for over 4 years. She is a cunning and manipulative individual, who will go to any extreme to captivate you.
Had I been brought in by the courts, my recommendation would have been Limited Supervised Visitation. After speaking with Dr. Grief, I assumed that this would be her recommendation as well. I would have also recommended that [plaintiff] continue therapy to improve her relationship with her children, and to make her realize that involving them in her belief system especially Brandon, is harmful and dangerous. I agree with the recommendation that a mediator should be assigned to work with both parents in dealing with the children.
Since the children have always been my first concern, I would be delighted to come in to testify. At this point in time, as opposed to the time they spoke with Dr. Grief, the children are genuine in their fears and anxieties, and more comfortable to discuss them with others. I believe that they have a better handle on expressing their needs and desires. It would be an enormous mistake, to expose them to the ideology of a woman with obvious thought disorders. [Plaintiff] appears to be selfishly concerned with using the children to hurt her husband, rather than with what is best for them in these difficult times.
Thus, there was evidence from less intrusive sources, but yet, Dr. Smith submitted adverse statements against plaintiff. In light of the recognized procedure to test piercing of the privilege in Kozlov and our Supreme Court's recent instructions in Kinsella, supra, we are compelled to conclude that Dr. Smith's testimony at the January hearing and her subsequent report violated the psychologist-patient privilege.
Although not raised as a separate argument by plaintiff on this appeal, the trial judge properly dismissed that part of plaintiff's claim alleging that Dr. Smith gave false and inaccurate testimony at the January hearing. See Hawkins v. Harris, 141 N.J. 207, 215-22, 661 A.2d 284 (1995) (stating the litigation privilege extends to all statements or communications in connection with the judicial proceeding, not merely those in the courtroom).
We address one final point not raised in this appeal. That is, whether a psychologist may be liable in damages to a patient for an unauthorized divulgence of confidences.
*888 Prior to the creation of the various professional-client privileges, our Supreme Court held that a doctor was not liable for revealing confidential information about the patient. Hague v. Williams, 37 N.J. 328, 336-37, 181 A.2d 345 (1962). In Hague, plaintiffs sought the proceeds of an insurance policy following the death of their infant child. Id. at 329-30, 181 A.2d 345. The life insurance company interviewed defendant pediatrician who advised that the infant had had heart trouble since birth. Id. at 331, 181 A.2d 345. After the insurer denied coverage, plaintiffs sought damages against their pediatrician for wrongful disclosure of information to the insurer. Id. at 331-32, 181 A.2d 345. The Court noted that no New Jersey case had previously addressed this issue and that few other jurisdictions had either. Id. at 332, 181 A.2d 345. Since the Legislature had not yet adopted the physician-patient privilege by statute, the Court found that in our State the "policy is to expose such information to view when it is relevant to the resolution of litigation." Id. at 335, 181 A.2d 345. The Court explained this was consistent with "the general theory that society has a right to testimony and that all privileges of exemption from this duty are exceptional." Ibid.
Despite finding a policy to reveal relevant information in a testimonial context, the Court found a general duty not to make disclosure in the non-testimonial context.
However, the same philosophy does not apply with equal rigor to non-testimonial disclosure. The above ethical concepts, although propounded by the medical profession under its own code, are as well expressive of the inherent legal obligation which a physician owes to his patient. The benefits which inure to the relationship of physician-patient from the denial to a physician of any right to promiscuously disclose such information are self-evident. On the other hand, it is impossible to conceive of any countervailing benefits which would arise by according a physician the right to gossip about a patient's health.
[Id. at 335-36, 181 A.2d 345.]
The Court expressed that "ordinarily a physician receives information relating to a patient's health in a confidential capacity and should not disclose such information without the patient's consent, except where the public interest or the private interest of the patient so demands." Id. at 336, 181 A.2d 345.
In Stempler v. Speidell, 100 N.J. 368, 495 A.2d 857 (1985), the Court interpreted Hague as recognizing that in a proper case, a patient could maintain an action for damages against a doctor for unauthorized disclosure of confidential information. Id. at 377, 495 A.2d 857. Other jurisdictions have reached this same result. See Hammonds v. Aetna Cas. & Sur. Co., 243 F.Supp. 793, 801-02 (N.D.Ohio 1965) (recognizing that "the unauthorized revelation of medical secrets, or any confidential communication given in the course of treatment, is tortious conduct which may be the basis for an action in damages"); Horne v. Patton, 291 Ala. 701, 708-09, 287 So.2d 824 (1973) (finding that breach of duty not to make extra-judicial disclosures of information acquired in the course of the doctor-patient relationship will give rise to a cause of action); MacDonald v. Clinger, 84 A.D.2d 482, 446 N.Y.S.2d 801, 804 (App.Div.1982) (finding that wrongful disclosure by psychiatrist of personal information learned during the course of treatment gives rise to a cause of action sounding in tort).
In enacting the psychologist-patient privilege and other professional-client privileges, the Legislature changed the policy of this State. See N.J.S.A. 2A:84A-22.2 (physician-patient privilege); N.J.S.A. 45:8B-29 (counselor-client privilege); N.J.S.A. 45:14B-28 (psychologist-patient privilege); N.J.S.A. 2A:84A-20 (lawyer-client privilege). Now the policy is clear that a psychologist may not disclose information revealed by a patient without the *889 patient's consent or without court approval unless certain conditions not applicable here are present. N.J.S.A. 45:14B-28; N.J.R.E. 505. See also N.J.S.A. 2A:62A-16.[1]
As noted by the Court in Kinsella, the purpose of the psychologist-patient privilege is to protect the revelation of the patient's "innermost thoughts and feelings" and "make[s] possible open and therefore productive relationship between therapists and patients." Kinsella, supra, 150 N.J. 276, 295, 696 A.2d 556; see also Stempler, supra, 100 N.J. at 374, 495 A.2d 857 (physician-patient privilege is "justified because it encourages candid communication between patient and doctor without fear of unauthorized disclosures"); Fellerman, supra, 99 N.J. at 502, 493 A.2d 1239 (lawyer-client privilege recognizes that "the public is well served by sound legal counsel based on full and candid communication between attorneys and their clients").
The psychologist-patient privilege is "placed on the same basis as" the lawyer-client privilege. N.J.S.A. 45:14B-28. As noted by the Supreme Court in Kinsella, in some respects the psychologist-patient privilege is even more compelling than the lawyer-client privilege. Kinsella, supra, at 329-330, 696 A.2d 556. Moreover, the psychologist-patient privilege has been "given greater scope and protection than the physician-patient privilege." State v. L.J.P., supra, 270 N.J.Super. at 438, 637 A.2d 532; see also Kinsella, supra at 298 n. 1, 696 A.2d 556.
With this background, we are satisfied our Supreme Court would extend the same judicial recognition to a patient seeking damages against a psychologist as a patient seeking damages against a physician for unauthorized disclosure of confidential information. See Stempler, supra, 100 N.J. at 377, 495 A.2d 857. The Court has established procedural safeguards in the testimonial context to determine whether in a particular case the trial court should authorize disclosure of confidential communications. See In re Kozlov, supra, 79 N.J. at 243-44, 398 A.2d 882. Consequently, if a psychologist fails to raise the privilege of the patient and makes disclosure of confidential information without a determination by the court that disclosure is required, the psychologist has breached a duty owed to the patient. See N.J.S.A. 45:14B-28; In re Kozlov, supra, 79 N.J. at 243-44, 398 A.2d 882. Under these circumstances, we conclude the patient has a cause of action against the psychologist for the unauthorized revelation of confidential information received in the course of treatment.
We reverse the entry of summary judgment in favor of defendants and remand for further proceedings.
NOTES
[1] Under N.J.S.A. 2A:62A-16a, psychologists, psychiatrists, marriage counselors, and other such professionals are "immune from any civil liability for a patient's violent acts against another person or against himself unless the practitioner has incurred a duty to warn and protect the potential victim ...." Such a practitioner is under a duty to warn when (1) the patient has communicated a threat of imminent harm against himself or a readily identifiable person and the practitioner reasonably believes the patient will carry out the threat; or (2) the practitioner assesses such circumstances that would lead the practitioner to reasonably believe that the patient intends to carry out an act of physical violence against himself ot a readily identifiable person. N.J.S.A. 2A:62A-16b. Moreover, such a practitioner is immune from civil liability if the practitioner discloses a privileged communication in fulfilling that duty to warn. N.J.S.A. 2A:62A-16d. Here, there is no evidence that would give rise to a duty to warn in order to implicate N.J.S.A. 2A:62A-16. Even if there were such evidence, in the context of the emergency hearing, an in camera proceeding would have been the proper mechanism to determine whether privileged communications should have been disclosed.