760 A.2d 1156 (2000)
335 N.J. Super. 60
Constance E. CORREIA, General Administratrix and Administratrix ad Prosequendum of the Estate of Curtis Anthony Correia, deceased, Plaintiff,
v.
Kenneth V. SHERRY and Hugh E. Sherry, and John Does First Through Fifteenth (names being fictitious), Defendants.
Superior Court of New Jersey, Law Division, Sussex County.
Decided June 6, 2000.
Melissa H. Luce, Morristown, for plaintiff (Stephen S. Weinstein, attorneys).
*1157 Donald S. McCord, Morristown, for defendants (O'Donnell, McCord, Helfrich & DeMarzo, attorneys).
GRAVES, J.S.C.
On March 10, 1998, Curtis Anthony Correia was a passenger in a pick-up truck operated by defendant, Kenneth Sherry. Curtis died as a result of injuries he sustained when the vehicle left the roadway and collided with a large boulder. At the time of his death, Curtis was 18 years old and a senior at Lenape Valley Regional High School. This wrongful death action was initiated by the decedent's mother on behalf of herself, Curtis's father, his two brothers and a sister. At her deposition, Curtis's mother testified that Curtis had been involved with the child study team at Lenape Valley Regional High School. The defendants now seek a court order compelling the plaintiff to authorize the release of Curtis's child study team records. For the reasons that follow, the application is denied.
"Generally, the loss of a child's consortium is the loss or decrease of the child's earnings, services, companionship or contributions as a result of a defendant's negligence." Mealey v. Marella, 328 N.J.Super. 129, 132, 744 A.2d 1226 (Law Div.1999) (citations omitted). To support her claim for damages, the plaintiff retained an expert who conducted an economic loss study with respect to the death of Curtis Correia. Plaintiff's expert summarized his findings as follows:
The economic loss attributable to the death of Curtis Correia is $312,423, in present value. It consists of the parents' loss of his care, assistance, guidance, advice and companionship.
In addition to the loss of services there is the loss of Curtis's future income. I projected it on the basis of the average earnings of males with high school education. The present value of this income, projected over the parents' life expectancy, is $591,925, after taxes. Any loss of financial support to the parents will have to be determined at the time of trial considering Curtis's projected income and family circumstances.
To assess the likelihood that Curtis would provide his parents with care, companionship, guidance, advice and assistance, the plaintiff's expert interviewed the decedent's mother, father, and a brother. Based on information obtained from these interviews, plaintiff's expert concluded that Curtis maintained a good relationship with his parents. He was kind, mature and responsible and he helped around the house. Furthermore, the economic loss study includes the following information:
Curtis was mature and responsible. He had worked in a gas station the summer before his death and previously worked in a restaurant. He wanted to pursue a career in Law Enforcement and was advised that military service might offer a great advantage in obtaining such a position in the civilian sector.
The plaintiff provided defense counsel with Curtis's academic grades, test scores, attendance records and other school records unrelated to the child study team. The plaintiff claims that all documents relating to the child study team are privileged pursuant to the psychologist-patient relationship. In accordance with N.J.S.A. 18A:46-5.1, the basic child study team consists of a school psychologist, a learning disability teacher consultant and a school social worker. The records not pertaining to the school psychologist will be discussed later in this opinion.
In support of their notice of motion to compel the production of the child study team records, the defendants initially argue "[W]here the records pertain to a deceased person through whom the plaintiff is claiming wrongful death damages, no privilege exists." In addition, the defendants contend that the plaintiff should not be permitted to claim future pecuniary losses on the one hand, and withhold relevant records on the other. The defendants contend that the child study team *1158 records may be probative with respect to the decedent's relationship with his parents, as well as his ability to perform military service, or to pursue a career in law enforcement.
The plaintiff's expert did not have access to Curtis's child study team records when he prepared his report. Therefore, there is no claim that Court Rule 4:10-2(d)(1) mandates disclosure of the child study team records. "The Rule requires a party to disclose to other parties an otherwise privileged communication made to his or her attorney or expert if that communication is used by the expert to arrive at an opinion that the expert will give at trial." Coyle v. Estate of Simon, 247 N.J.Super. 277, 282-83, 588 A.2d 1293 (App.Div.1991) (footnote omitted).
The threshold issue is whether the privilege relied upon by the plaintiff survives the death of Curtis Correia. The psychologist-patient privilege as set forth in both N.J.S.A. 45:14B-28 and N.J.R.E. 505 reads as follows:
The confidential relations and communications between and among a licensed practicing psychologist and individuals, couples, families or groups in the course of the practice of psychology are placed on the same basis as those provided between attorney and client, and nothing in this act shall be construed to require any such privileged communications to be disclosed by any such person.
There is no privilege under this section for any communication: (a) upon an issue of the client's condition in an action to commit the client or otherwise place the client under the control of another or others because of alleged incapacity, or in an action in which the client seeks to establish his competence or in an action to recover damages on account of conduct of the client which constitutes a crime: or (b) upon an issue as to the validity of a document as a will of the client; or (c) upon an issue between the parties claiming by testate or intestate succession from a deceased client.
[N.J.S.A. 45:14B-28; N.J.R.E. 505.]
The purpose of this privilege is to promote an open and productive relationship between the psychologist and patient in order to facilitate effective mental health counseling and treatment. Kinsella v. Kinsella, 150 N.J. 276, 295, 696 A.2d 556 (1997); Arena v. Saphier, 201 N.J.Super. 79, 89, 492 A.2d 1020 (App.Div.1985).
The nature of the psychotherapeutic process is such that full disclosure to the therapist of the patient's most intimate emotions, fears and fantasies is required. The patient rightfully expects that his personal revelations will not generally be subject to public scrutiny or exposure ... a [psychologist] must have his patient's confidence or he cannot help him.
[Arena v. Saphier, 201 N.J.Super. 79, 86, 492 A.2d 1020 (App.Div.1985) (citing Taylor v. United States, 222 F.2d 398, 401 (D.C.Cir.1955)) (footnote omitted).]
N.J.S.A. 45:14B-28 and N.J.R.E. 505 do not discuss whether the psychologist-patient privilege survives death, nor does a reported case in this state. However, since New Jersey has modeled the psychologist-patient privilege after the attorney-client privilege, Swidler & Berlin v. United States, 524 U.S. 399, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998), discussing the survivability of the attorney-client privilege provides useful guidance. Swidler & Berlin arose from the Independent Counsel's investigation of the White House Travel Office. Id. at 401, 118 S.Ct. at 2083. In July 1993, Vincent Foster, Deputy White House Counsel, met with James Hamilton, an attorney at Swidler & Berlin, to discuss legal representation concerning possible investigations into the dismissal of White House Travel Office employees. Ibid. Foster committed suicide nine days after the meeting. Id. at 402, 118 S.Ct. at 2083. In December 1995, a federal grand jury issued a subpoena for the notes of Hamilton's meeting with Foster. Swidler & *1159 Berlin, supra, 524 U.S. at 402, 118 S.Ct. at 2083. Swidler & Berlin sought to quash the subpoena arguing that the notes were privileged. The Supreme Court agreed and held that the notes were protected by the attorney-client privilege notwithstanding Foster's death. Id. at 401, 118 S.Ct. at 2083.
The Court examined case law throughout the United States and concluded that at common law the attorney-client privilege survived death. Swidler & Berlin, supra, 524 U.S. at 405-406, 118 S.Ct. at 2085. The Court was also satisfied that the purposes underlying the attorney-client privilege endure after the death of the client. "Knowing that communications will remain confidential even after death encourages the client to communicate fully and frankly with counsel." Swidler & Berlin, supra, 524 U.S. at 407, 118 S.Ct. at 2086. Additionally, the Court noted that the loss of evidence resulting from the privilege surviving death was more imaginary than real. "Without assurance of the privilege's posthumous application, the client may very well not have made disclosures to his attorney, at all, so the loss of evidence is more apparent than real." Swidler & Berlin, supra, 524 U.S. at 408, 118 S.Ct. at 2087.
The same considerations apply to the psychologist-patient privilege. "It is clear that the psychologist-patient privilege should be treated similarly to the lawyer-client privilege." Runyon v. Smith, 322 N.J.Super. 236, 242, 730 A.2d 881 (App.Div.1999) (citing Kinsella, supra, 150 N.J. at 297, 696 A.2d 556), aff'd 163 N.J. 439, 749 A.2d 852 (2000). "Patients are aware of the privilege and its limits because psycho-therapists generally believe themselves to be ethically bound at the outset of the therapy relationship to inform their patients of the limits of confidentiality." Kinsella, supra, 150 N.J. at 296, 696 A.2d 556 (citing Jaffee v. Redmond, 518 U.S. 1, 13 n. 12, 116 S.Ct. 1923, 1930 n. 12, 135 L.Ed.2d 337, 347 n. 12 (1996)). In Arena, the court recognized that the purpose of the psychologist-patient privilege is to foster full disclosure of the patient's most intimate emotions, fears and fantasies in order to promote effective psychological treatment. Arena, supra, 201 N.J.Super. at 86, 492 A.2d 1020. Just as a client may be unwilling to convey embarrassing and harmful information to their attorney without assurances that the communications will remain confidential, patients seeking psychological treatment may be unwilling to disclose their most intimate emotions, fears and fantasies if such communications may eventually be subject to disclosure. As stated in Swidler & Berlin, "Posthumous disclosure of such communications may be as feared as disclosure during the client's lifetime." Swidler & Berlin, supra, 524 U.S. at 407, 118 S.Ct. at 2086. Posthumous disclosure of communications between a patient and a psychologist could damage the reputation of the deceased patient and cause embarrassment and humiliation to the patient's family and friends. Therefore, in order to promote full disclosure and effective treatment during the life of the patient, it is necessary for the privilege to survive the death of the patient.
An additional consideration also justifies recognition of the privilege after the patient's death. In Kinsella, the New Jersey Supreme Court noted that even when a psychologist's notes are disclosed during the patient's lifetime, there is the potential for serious harm to the patient, as well as the patient's family. "Made public and taken out of context, the disclosure of notes from therapy sessions could have devastating personal consequences for the patient and his or her family ..." Kinsella, supra, 150 N.J. at 330, 696 A.2d 556. This potential for harm may increase when the patient has died. In such cases, the need for the privilege can be even greater because the patient cannot respond to attacks upon his or her character, reputation and good name. As noted by plaintiff's counsel, "Curtis is not here to refute *1160 or confirm or explain anything that may be found within the privileged records."
Even though the psychologist-patient privilege survives death, the privilege is not absolute or sacrosanct. All evidentiary privileges can conflict with the search for the truth. As noted in In re Selser, 15 N.J. 393, 405, 105 A.2d 395 (1954), "[T]he fullest disclosure of the facts will best lead to the truth and ultimately to the triumph of justice." Therefore, it has been noted in connection with the attorney-client privilege that "[C]onsiderations of public policy and concern for proper judicial administration have led the legislature and the courts to fashion limited exceptions to the privilege. These exceptions attempt to limit the privilege to the purposes for which it exists." Fellerman v. Bradley, 99 N.J. 493, 502, 493 A.2d 1239 (1985) (citations omitted). Specific exceptions to the psychologist-patient privilege are set forth in N.J.S.A. 45:14B-28 and N.J.R.E. 505. Additionally, in criminal cases, the psychologist-patient privilege may be required to yield to a defendant's right to a fair trial. State v. McBride, 213 N.J.Super. 255, 269-272, 517 A.2d 152 (App.Div.1986); State v. L.J.P., 270 N.J.Super. 429, 440-441, 637 A.2d 532 (App.Div.1994). The privilege may also be pierced in child custody cases. Fitzgibbon v. Fitzgibbon, 197 N.J.Super. 63, 69, 484 A.2d 46 (Ch.Div.1984). Finally, in certain circumstances, "[A] duty to warn and protect" is imposed upon a psychologist. N.J.S.A. 2A:62A-16.
When a specific exception does not apply, cases interpreting the attorney-client privilege provide appropriate guidance. Runyon v. Smith, supra, 322 N.J.Super. at 242, 730 A.2d 881, aff'd 163 N.J. 439, 749 A.2d 852 (2000). In the case of In re Kozlov, 79 N.J. 232, 398 A.2d 882 (1979), the Court adopted a three-part test to determine if the attorney-client privilege should be overridden to compel disclosure. First, "There must be a legitimate need of the party to reach the evidence sought to be shielded." Id. at 243, 398 A.2d 882. Second, "There must be a showing of relevance and materiality of that evidence to the issue before the court." Id. at 243-244, 398 A.2d 882. Finally, the party seeking disclosure must show by a fair preponderance of the evidence that the information cannot be secured from any less intrusive source. Ibid. The burden is upon the party seeking to pierce the privilege to establish these three "foundations." Kinsella, supra, 150 N.J. at 299, 696 A.2d 556.
In this case, counsel for the defendants candidly acknowledges that he does not know whether or not the information contained in the child study team records is relevant. The nature of the case and the issues in dispute help to resolve the question of relevancy. As noted in State v. Swint, 328 N.J.Super. 236, 745 A.2d 570 (App.Div.2000), "In determining whether evidence is relevant, the inquiry should focus upon the logical connection between the proffered evidence and a fact in issue." State v. Swint, 328 N.J.Super. 236, 252, 745 A.2d 570 (App.Div.2000) (citation omitted). This case involves a claim by a mother for the wrongful death of her son. In such cases, the Court has held:
[D]amages should not be limited to the well-known elements of pecuniary loss such as the loss of the value of the child's anticipated help with household chores, or the loss of anticipated direct financial contributions by the child after he or she becomes a wage earner. We hold that in addition, the jury should be allowed, under appropriate circumstances, to award damages for the parents' loss of their child's companionship as they grow older, when it may be most needed and valuable, as well as the advice and guidance that often accompanies it. As noted later, these other losses will be confined to their pecuniary value, excluding emotional loss.
[Green v. Bittner, 85 N.J. 1, 4, 424 A.2d 210 (1980).]
Curtis Correia was a passenger in a motor vehicle operated by a defendant at *1161 the time of his death. Thus, it is likely that the quantum of damages will be the primary issue to be resolved by the jury. "Pecuniary injuries" suffered by the surviving next of kin is the standard for all wrongful death cases. N.J.S.A. 2A:31-5. A portion of the wrongful death model jury charge provides the following instructions:
[I]t is up to you, the jury, to decide what services the decedent would have rendered to the survivors, and what the value of these services is. In doing so, remember that there need be no proof that the parents will probably purchase such companionship and advice; it is sufficient that the deceased would have rendered them if he/she had lived.
In considering those various factors, and in ascertaining the probabilities of pecuniary loss, you should also consider the decedent's personality and character, his/her habits and customs and the relationship that existed between the decedent and the survivors.
[Model Jury Charge, Civil § 6.16.]
Expert testimony to establish pecuniary damages in wrongful death cases is not necessary; however, it is often helpful. Green, supra, 85 N.J. at 17, 424 A.2d 210; Brown v. Kennedy Memorial Hospital, 312 N.J.Super. 579, 593-594, 711 A.2d 1370 (App.Div.1998). Of course, it is impossible for an expert witness or a jury to read the future and to know what course an 18-year-old's life will take. Nevertheless, expert testimony can assist a jury by providing a methodology or process for reasonably estimating the pecuniary loss to survivors. As noted in Green:
Who knows what the child's circumstances would be, or whether the parent would indeed become old or infirm and require such companionship, or need such advice at any time? Given the speculative quality of the inferences, it might further be questioned whether one could realistically attach an estimated pecuniary value to such services. Our answer is, even assuming no special circumstances are proven, that the nature of these cases has led our courts to allow damages even though the inferences, and the estimate of damages, are based on uncertainties. (citations omitted). When a parent dies and loss of advice, guidance and counsel is allowed to the surviving children, and when an infant child dies and loss of prospective services is allowed to the parents, the proof that suffices is the parent-child relationship and what we assume the jury can conclude from that relationship alone.
[Green, supra, 85 N.J. at 15, 424 A.2d 210.]
Chief Justice Wilentz noted that a claim for pecuniary injuries in a wrongful death case always involves some speculation and estimation of damages based on uncertainties. Moreover, in cases involving the wrongful death of a child, the prospective loss of care, companionship, advice, counsel and guidance may even be "[S]omewhat more conjectural." Id. at 16, 424 A.2d 210. Nevertheless, if this case is tried, a jury will be able to utilize its common knowledge and experience to engage in "[A] rational computation of probabilities." Rowe v. N.Y. etc., Tel. Co., 66 N.J.L. 19, 22, 48 A. 523 (Sup.Ct.1901). In the event of a trial, a jury will certainly be afforded an opportunity to fully consider the decedent's personality and character, as well as the closeness of the parent-child relationship that existed between Curtis and his parents. Nevertheless, relevant information regarding these issues is readily available from individuals who knew Curtis and his family. Therefore, there is no compelling justification to pierce the psychologist-patient privilege to obtain information regarding these matters.
When evaluating the prospective ability of Curtis to make monetary contributions to his parents, the plaintiff's expert assumed that Curtis would obtain a high school diploma and that his income would be consistent with the average earnings of *1162 males with a high school education. The plaintiff's expert calculated that the present value of the decedent's income projected over the parents' life expectancy "[I]s $591,925, after taxes." Naturally, this figure can represent nothing more than a reasonable estimate based on a number of probabilities, including the life expectancy of Curtis and his parents, as well as the anticipated effect of wage trends, inflation, interest and taxes. If Curtis had lived, his capacity to provide future financial assistance to his parents would have depended, primarily, on his own financial needs and overall circumstances. An important assessment in this regard is the likelihood that Curtis would marry and establish a family and home of his own some day. Naturally, such developments would tend to diminish Curtis's ability to make financial contributions to his parents notwithstanding his desire to do so.
Because of the inherent uncertainties in computing economic losses in wrongful death cases, trial judges have been advised to instruct juries that any aggregate figures offered by an expert are "[N]ecessarily based on the reliability of the assumptions that the expert may have made ..." DeHanes v. Rothman, 158 N.J. 90, 93, 727 A.2d 8 (1999). In DeHanes, the court noted that "A jury's common knowledge and experience is always available to help it assess whether an aggregate sum or `bottomline' figure presented by counsel or an expert represents fair and just compensation." Id. at 102, 727 A.2d 8. Furthermore, the court noted that economic calculations by an expert can be readily challenged during cross-examination. "[O]ur discovery rules allow anticipation of an expert's testimony so that an expert's economic projections may be completely rebutted, if not destroyed." Id. at 101, 727 A.2d 8. Moreover, if the defendants believe that the economic assumptions relied upon by the plaintiff's expert are unrealistic, they are free to produce testimony from their own expert.
Curtis's projected income was based upon average earnings for males with a high school education. There is no claim for special circumstances. Curtis's high school grades and other academic records have already been furnished to the defendants. There is nothing in these academic records to suggest that Curtis would not have successfully graduated from high school in June of 1998. In fact, these records confirm that on June 20, 1998, more than three months after his death, Lenape Valley Regional High School awarded a high school diploma to Curtis Correia posthumously.
Not all of the records sought by the defendants pertain to Curtis's communications with a psychologist. Given the composition of the child study team, the court conducted an in camera review to determine the nature and content of the documents sought by the defendants. Curtis's child study team records reveal that each year Curtis's mother was advised that her son's child study team records were confidential. Similarly, following his eighteenth birthday, Curtis was also informed of the confidentiality of his child study team records. There is no question that Curtis and his parents reasonably believed that their communications with the school psychologist and other members of the child study team were confidential. Educational records are confidential and access to such records is restricted pursuant to N.J.S.A. 18A:36-19 and N.J.A.C. 6:3-6.5. N.J.S.A. 45:15BB-13 also provides that communications to a licensed or certified social worker are privileged and shall only be disclosed in limited circumstances. N.J.S.A. 45:15BB-13.
This is not an ordinary discovery motion where the moving party must merely show that the requested information is relevant or that such information is "[R]easonably calculated to lead to the discovery of admissible evidence." R. 4:10-2.(a). Under Kozlov, the standard is higher because of the need to strike a "[D]elicate balance between two of the basic but competing *1163 principles underpinning our system of jurisprudence." Blitz v. 970 Realty Associates, 233 N.J.Super. 29, 38, 557 A.2d 1386 (App.Div.1989).
"A privilege reflects a societal judgment that the need for confidentiality outweighs the need for disclosure." Payton v. New Jersey Turnpike Authority, 148 N.J. 524, 539, 691 A.2d 321 (1997) (citations omitted). In this case, the defendants have failed to establish, pursuant to the Koslov standard, that the evidentiary need for disclosure outweighs the reasons for confidentiality. An in camera review of the disputed documents does not lead to a contrary conclusion. Therefore, the defendants' application to compel the plaintiff to authorize the release of child study team records is denied.