NOTICE

*The text of this opinion can be corrected before the opinion is published in the Pacific Reporter. Readers are encouraged to bring typographical or other formal errors to the attention of the Clerk of the Appellate Courts:*

*303 K Street, Anchorage, Alaska 99501*
*Fax: (907) 264-0878*
*E-mail: corrections@akcourts.gov*

IN THE COURT OF APPEALS OF THE STATE OF ALASKA

| | |
|---|---|
| JOHN ROBERT DOUGLAS, | Court of Appeals Nos. A-12755 & A-12756 |
| Appellant, | Trial Court Nos. 3AN-14-04783 CR & 2KB-05-00526 CR |
| v. | |
| STATE OF ALASKA, | O P I N I O N |
| Appellee. | No. 2741 — March 17, 2023 |

Appeal from the Superior Court, Third Judicial District, Anchorage, Michael L. Wolverton, Judge.

Appearances: Justin Facey, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for the Appellant. Diane L. Wendlandt, Assistant Attorney General, Office of Criminal Appeals, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for the Appellee.

Before: Allard, Chief Judge, and Wollenberg and Harbison, Judges.

Judge ALLARD.

In *N.G. v. Superior Court*, we addressed, but did not resolve, the question of whether there are circumstances under which a government witness's assertion of the psychotherapist-patient privilege must yield to a criminal defendant's constitutional right

to a fair trial.[1] In *N.G.*, we noted that the majority of jurisdictions addressing this issue had concluded that "if the defendant makes a sufficient preliminary showing, the defendant is entitled to have the trial court conduct an *in camera* inspection of a government witness's mental health records," and had further concluded that "the witness's psychotherapist-patient privilege can be overridden if the trial court concludes that portions of those records are sufficiently relevant to the defendant's guilt or innocence, or are sufficiently relevant to the witness's credibility."[2]

Although we noted this majority approach in *N.G.*, we did not directly adopt the majority rule under Alaska law because we concluded that resolution of *N.G.* did not require us to decide this issue.[3] The current case, however, requires us to resolve this issue and to further define the legal standard that a defendant must meet to obtain *in camera* review of privileged mental health records that are in the hands of a third party and not known to the prosecution.[4]

The defendant in the current case, John Robert Douglas, was convicted, following a jury trial, of second-degree sexual assault for grabbing a woman's breast in an elevator.[5] At the time of the incident, the woman (R.D.) had a full legal guardian who

---

[1]  *N.G. v. Superior Court*, 291 P.3d 328, 335-38 (Alaska App. 2012).

[2]  *Id.* at 337.

[3]  *Id.* at 337-38.

[4]  *But cf. Gunnerud v. State*, 611 P.2d 69, 71-73 (Alaska 1980) (addressing standard for obtaining witness's psychotherapy records that are in the possession of the prosecution); *Spencer v. State*, 642 P.2d 1371, 1374-76 (Alaska App. 1982) (same).

[5]  Former AS 11.41.420(a)(1) (2014).

had been appointed ten years earlier after R.D. suffered a traumatic brain injury from a serious car accident.[6]

Prior to trial, Douglas moved for discovery of neuropsychological records in R.D.'s guardianship file on the ground that these records likely contained information that could be favorable to the defense regarding R.D.'s ability to recall, comprehend, and accurately relate what occurred in the elevator. Douglas renewed this motion during trial, after it became clear that R.D. had memory issues and still suffered from some of the cognitive effects of the traumatic brain injury.

The superior court denied both requests, ruling that it had no authority to order an *in camera* review under our decision in *N.G.* because the neuropsychological reports were privileged by statute and by Alaska's psychotherapist-patient privilege.

But, as just explained, *N.G.* did not resolve the question of whether Alaska's psychotherapist-patient privilege can be overridden in criminal cases, and our decision provided very little guidance on what type of showing a defendant must make to obtain *in camera* review of otherwise privileged mental health records. Accordingly, we now resolve those questions by formally adopting a test similar to the one used by the majority of jurisdictions that have addressed this issue. Under this test, a defendant is entitled to *in camera* review of privileged mental health records if the defendant can show a reasonable likelihood that the records contain exculpatory evidence that is relevant to the defense and unavailable from less intrusive sources. If the *in camera* inspection subsequently reveals materially exculpatory evidence — *i.e.*, evidence,

_____

⁶ *See* AS 13.26.316(c) (providing that a guardian of an incapacitated person has the same powers and duties for the ward that a parent has for an unemancipated minor child, with few exceptions); AS 13.26.201 (describing the purpose of a guardian and basis for a guardianship); AS 13.26.266 (allowing for the court appointment of a guardian if the court determines that a person is incapacitated and services of a guardian are necessary).

including impeachment evidence, that is favorable to the accused and material to guilt or innocence — then that evidence must be disclosed to the defendant.

Because we conclude that Douglas met this standard, we remand this case to the superior court so that the court can conduct the requested *in camera* review and disclose any materially exculpatory evidence that may exist in the records. The parties may then litigate whether Douglas is entitled to a new trial or whether the failure to conduct the *in camera* review was harmless beyond a reasonable doubt under the facts of this case.

*Background facts and prior proceedings*

On May 30, 2014, R.D. went to pick up a check from her guardian at the Office of Public Advocacy. R.D. went into the building alone, although her mother waited for her outside the building.

After picking up her check, R.D. noticed a man (later identified as Douglas) standing next to her at the elevators looking at his phone. He bumped into her while they were waiting for the elevator, but she thought that it was accidental. When the elevator arrived, they both boarded the elevator. Douglas stood right next to R.D., even though the elevator was otherwise empty. The elevator stopped on another floor and three people got on. The elevator stopped again and the three people got off, leaving R.D. alone with Douglas.

According to R.D.'s testimony at trial, as the elevator doors closed, Douglas "grabbed [R.D.'s] boob and . . . private part." Douglas grabbed R.D.'s right breast "[r]eally, really, really hard" with one hand and "dug[] . . . really hard" into the "middle" of R.D.'s "vagina area" with the other. R.D. testified that she began to scream and Douglas punched her "[v]ery hard" in her forehead, above her right eye.

When the elevator doors opened to the lobby, a receptionist saw R.D. and Douglas engaged in a struggle. The receptionist testified that at first she thought they were "horsing around" with Douglas pushing and pulling at R.D. and her telling him to "knock it off" and "[s]top it." But then she saw Douglas attempt to rip R.D.'s pants down and she heard R.D. screaming for Douglas to stop. The receptionist stood up from her desk and made eye contact with Douglas, who moved like he was going to leave. She then called building security.

While the receptionist was still on the phone with building security, Douglas came back to the elevators where R.D. was standing. The receptionist heard "a blood-curdling scream" followed by R.D.'s cries that Douglas was hurting her. The receptionist ran into the lobby. Douglas then ran out of the building and was chased by two co-workers of the receptionist who had been alerted to what was going on.

The receptionist called 911. While she was calling 911, the receptionist saw R.D. crying, walk outside, clutch her lower abdomen, and collapse.

The two co-workers caught up with Douglas at a nearby parking garage, and Douglas was apprehended by security personnel.

Anchorage Police Officer Heidi Schaeffer interviewed R.D. at the scene. R.D. was "very upset" but she declined medical attention. R.D. told the officer that Douglas had grabbed her breast and genital area during the assault. Officer Schaeffer noticed a red scratch on R.D.'s left forearm, but she did not take any photographs.

Officer Schaeffer took R.D. to the police car where Douglas was handcuffed. When R.D. and Officer Schaeffer both looked into the window, Douglas began making "crude" facial expressions, wagging his tongue back and forth. R.D. identified Douglas as her assailant. When Officer Schaeffer escorted Douglas to jail, she noticed that his jeans were buttoned, but unzipped.

A grand jury later indicted Douglas on one count of second-degree sexual assault for engaging in sexual contact ("hand to genitals and/or female breast") with R.D. "without consent."[7]

*Douglas's pretrial motion for <u>in camera</u> review of R.D.'s guardianship file*

At the grand jury hearing, R.D. testified that she had a full legal guardian. She characterized the guardian as someone who helps her with money issues. She also testified that she was in a car accident ten years earlier that left her with "[m]ajor" medical issues and caused her to walk slowly.

Following the grand jury proceedings, Douglas filed a motion requesting that the superior court provide discovery of the neuropsychological reports that were part of R.D.'s guardianship file. Douglas argued that these portions of the guardianship records were not privileged and instead were only "confidential" under Alaska law.[8] According to Douglas, there was good cause to conduct an *in camera* review of these parts of the guardianship file because the appointment of the guardian necessarily meant that R.D. had been found to be incapacitated by a court. Douglas further argued that the

---

[7] *See* former AS 11.41.470(8)(A) (2015) ("'without consent' means that a person . . . with or without resisting, is coerced by the use of force against a person or property, or by the express or implied threat of death, imminent physical injury, or kidnapping to be inflicted on anyone.").

[8] *See* AS 13.26.021(a) (formerly AS 13.26.013(a)) (allowing courts to release "[a]ll . . . information contained in the court records" relating to guardianship proceedings "upon court order for good cause shown"). *But see* AS 13.26.241(b) (formerly AS 13.26.109(b)) ("Statements of a ward or respondent in the course of evaluations, examinations, and treatment [in guardianship proceedings] are privileged, confidential, and not admissible without the ward's or respondent's consent in any civil or criminal proceeding other than [guardianship] proceedings[.]").

"major" medical issues that R.D. alluded to at the grand jury hearing likely included traumatic brain injury, and traumatic brain injuries can "affect [a person's] thinking skills, communication, and emotions."

The State opposed the motion, asserting that the neuropsychological and court visitor reports that Douglas wanted reviewed were privileged under Alaska law.[9] The State characterized Douglas's motion as a "fishing expedition" based on mere "speculat[ion]" that R.D. had a traumatic brain injury, and the State argued that there was no evidence that R.D. suffered from any cognitive deficits or that she had any difficulty perceiving or remembering the incident.

R.D. separately opposed the motion for *in camera* review, arguing that the requested portions of her guardianship file should be treated as absolutely privileged under Alaska law. She also argued, in the alternative, that any *in camera* review be limited to reports from the time of the events of this matter — May 30, 2014 — to the time of the motion.

The superior court denied Douglas's pretrial motion for *in camera* review of R.D.'s guardianship records. The superior court ruled first that the records were privileged under AS 13.26.241(b) (formerly AS 13.26.109(b)[10]) and Alaska Evidence Rule 504(b) (the psychotherapist-patient privilege), and that any *in camera* review would therefore be governed by this Court's decision in *N.G. v. Superior Court*.[11] The court

---

[9]     *See* AS 13.26.241(b) (formerly AS 13.26.109(b)); *see also* Alaska R. Evid. 504(b) (the psychotherapist-patient privilege).

[10]     Since the time of Douglas's offense and the proceedings before the superior court in this case, the guardianship statutes have been renumbered. However, they were not substantively changed and, going forward, we will refer to the current statutory numbering scheme.

[11]     *N.G. v. Superior Court*, 291 P.3d 328 (Alaska App. 2012).

then found that Douglas failed to meet even the *Booth* standard discussed in *N.G.* because he offered only "a number of very speculative assumptions" that R.D. had a traumatic brain injury.[12]

*Douglas's mid-trial renewed motion for <u>in camera</u> review of the neuropsychological reports*

At trial, more information about R.D.'s cognitive functioning emerged, including the fact that she *had* suffered a traumatic brain injury and that she had some memory issues as a result.

R.D.'s mother was the State's first witness. According to R.D.'s mother, R.D. suffered from brain damage as a result of injuries sustained in a 2004 car collision. For this reason, R.D. required a guardian.[13] She was also unable to live independently, and required a personal care assistant and a conservator to manage her finances.

R.D.'s mother testified that R.D. had "regained the majority of her memories," but she stated that R.D. occasionally had lapses in memory and had trouble keeping appointments straight. According to R.D.'s mother, R.D.'s long-term and short-term memory "seem[ed] to be working okay." And in response to defense counsel asking whether R.D. had a "hard time remembering things," R.D.'s mother stated, "Not things like this incident."

---

[12] *Booth v. State*, 251 P.3d 369, 377 (Alaska App. 2011) (determining that "a defendant must present a factual predicate for their discovery request — either pointing to facts already within the record, or making an offer of proof that provides the evidentiary foundation for the request").

[13] The record indicates that, at the time of the underlying incident, R.D. had a full guardian. However, it appears that the guardianship may have been partially dissolved by the time of trial, and there was testimony suggesting that R.D. no longer had a full guardian, although she did have a conservator and a personal care assistant.

R.D. also testified at the trial. R.D. testified that she had been in a car accident and "smashed [her] head really hard, and . . . had head trauma where . . . [her] brain fill[ed with] fluid, and all the fluid leaked out." The prosecutor asked R.D. if she was referring to a traumatic brain injury, and R.D. replied that she was. Later, when the defense attorney attempted to cross-examine R.D. about her injuries, R.D. asked what her "personal business" had to do with the case.

During her direct examination, R.D. testified that Douglas grabbed her breast "[r]eally, really, really hard." R.D. also testified that Douglas grabbed her above her vagina, but that he did not touch her vagina.

The next day, after the State had rested its case-in-chief, R.D. told the prosecutor's paralegal that, after thinking it over the previous night, she remembered more of what had happened during her altercation with Douglas and she wanted to supplement her testimony. Specifically, R.D. wanted to clarify that she now remembered that Douglas *had* touched her vagina. The prosecutor accordingly moved to reopen the State's case.

The defense attorney objected to the State's case being reopened. The defense attorney also argued that this kind of situation might have been avoided if the court had granted discovery of the neuropsychological records because the parties would have better known how to prepare for R.D.'s testimony.

The court had R.D. testify outside the presence of the jury to determine what she wanted to say. Using a tissue box to demonstrate, R.D. testified that she was thinking about the incident last night and she now remembered that Douglas's palm had been on her vagina at the time he was grabbing at her lower abdomen. The defense attorney expressed frustration at trying to cross-examine R.D., noting, "[W]e're dealing with a complaining witness who has a serious traumatic brain injury." The superior court acknowledged that this was the case.

Douglas then renewed his request for an *in camera* review of the neuropsychological reports in the guardianship file, arguing that the testimony at trial had established that R.D. had a traumatic brain injury and that she might have cognitive difficulties and problems perceiving and remembering events.

Significantly, the prosecutor did not oppose the *in camera* review. The prosecutor pointed out that he had not been the assigned prosecutor when the initial *in camera* review request was litigated and he was not familiar with the litigation. But he "assum[ed] if there had been matters in the confidential filing that touched on memory loss, that the [c]ourt would have examined that . . . [and] ordered it disclosed." The prosecutor also stated that he "assum[ed] those [confidential] matters . . . remain in the sealed record of the court for appellate review," and he stated that he would leave it to the court's discretion whether to "reopen that issue and reexamine the *in camera* materials in light of this development."

The court took a short recess and then returned with its ruling. The court ruled that it would allow the State to reopen its case so that R.D. could testify to her new memory. But the court denied Douglas's renewed motion for an *in camera* review of the neuropsychological records in the guardianship file, concluding that this Court's decision in *N.G.* precluded any such review. The court noted that it had been the trial court in *N.G.* and that, while it disagreed with this Court's decision in *N.G.*, it was bound to follow it.

R.D. then testified for a second time, stating that she now remembered that Douglas's palm had been on her vagina at the time he grabbed at her "private area." On cross-examination, R.D. acknowledged that she had not said this explicitly in her police report or grand jury testimony.

Following the close of evidence, the defense attorney moved for a judgment of acquittal on the hand-to-vagina theory of sexual assault. The court denied the motion.

– 10 –

2741

During closing argument, the defense attorney argued that Douglas was trying to steal R.D.'s check, but that he did not sexually assault her. The defense attorney focused on the inconsistencies between R.D.'s testimony and her mother's testimony. The defense attorney also emphasized R.D.'s memory problems.

The jury ultimately determined beyond a reasonable doubt that Douglas had touched R.D.'s breast "without consent."[14] However, the jury did not reach a unanimous verdict with regard to the allegation that Douglas had touched R.D.'s vagina.

This appeal followed.[15]

*The parties' arguments on appeal regarding whether the information that would be subject to the <u>in camera</u> review is privileged or merely confidential*

In his opening brief, Douglas argues that he was seeking *in camera* review of information in the guardianship file that was merely confidential, not privileged. Douglas bases this argument on AS 13.26.021(a), the statute that sets forth the general disclosure rules for guardianship proceedings. This statute provides that, while some documents relating to the existence of a guardianship are available for public inspection,

---

[14]  *See* former AS 11.41.470(8)(A) (2015) ("'without consent' means that a person . . . with or without resisting, is coerced by the use of force against a person or property, or by the express or implied threat of death, imminent physical injury, or kidnapping to be inflicted on anyone").

[15]  We note that, following the jury's guilty verdict, the superior court revoked Douglas's probation in a separate case and imposed the remainder of his suspended sentence (Case No. 2KB-05-00526CR). Although the probation case was consolidated with the second-degree sexual assault case on appeal, Douglas does not challenge the adjudication or disposition of his probation violation.

the information contained in court records relating to a guardianship is otherwise confidential and may be released only to case participants or "for good cause shown."[16]

In response, the State argues that, while there are some parts of a guardianship file that are merely confidential, Douglas's request was primarily to have the neuropsychological reports reviewed, and those reports are privileged under Alaska Evidence Rule 504(b), the psychotherapist-patient privilege. The State also argues that any statements by R.D. in those records would be protected under AS 13.26.241(b), which provides:

> Statements of a ward or respondent in the course of evaluations, examinations, and treatment [in guardianship proceedings] are privileged, confidential, and not admissible without the ward's or respondent's consent in any civil or criminal proceeding other than [guardianship] proceedings[.]

In his reply brief, Douglas concedes that the State is correct and that the portions of the guardianship file that he sought to have reviewed are privileged.

We agree with the parties that the neuropsychological reports in the guardianship file are privileged under Alaska Evidence Rule 504(b). We also agree that, under AS 13.26.241(b), any statements by R.D. in the guardianship file are privileged. Because the majority of the requested *in camera* review would primarily involve privileged material, we now turn to our decision in *N.G. v. Superior Court*, in which we

---

[16] AS 13.26.021(a) ("A notice of the filing of a petition, a summary of all formal proceedings, and a dispositional order or modification or termination of a dispositional order relating to a proceeding under this chapter shall be available for public inspection. All other information contained in the court records relating to a proceeding under this chapter is confidential and available only upon court order for good cause shown . . . .").

discussed what standard should apply when a defendant seeks *in camera* review of privileged mental health documents that are held by a third party.[17]

### *Our decision in N.G. v. Superior Court*

The defendant in *N.G.* was charged with sexual assault, attempted sexual assault, and physical assault based on allegations that he had attacked a woman named N.G.[18] Prior to trial, the defendant moved for discovery of N.G.'s "medical, alcohol treatment[, and] psychiatric records," asserting that he was entitled to these records because they could include information that was relevant to his defense.[19] The only support that the defendant provided for this request was (1) case notes from the sexual assault examination report stating that N.G. had a history of alcohol abuse and "a history of bipolar disorder"; and (2) N.G.'s criminal history, which included convictions that may have been for alcohol-related crimes and may have included an alcohol blackout.[20]

In response to the defendant's request, the trial court issued an order requiring N.G. to produce the names and addresses of "every health care provider from whom she had ever sought medical treatment, psychiatric care or psychological counseling, or alcohol counseling or treatment."[21] The order also required N.G. to sign a blanket release authorizing all of these health care providers to turn their files over to the trial court so that the court could conduct an *in camera* review of the files and disclose any materials that were relevant to "[N.G.'s] ability to accurately perceive or

---

[17] *N.G. v. Superior Court*, 291 P.3d 328 (Alaska App. 2012).

[18] *Id.* at 329.

[19] *Id.* at 329-30.

[20] *Id.* at 329.

[21] *Id.*

truthfully report [the] events" at issue in the case.[22]  The trial court justified its order based on its view that the records would likely contain information that was not privileged under the psychotherapist-patient privilege.[23]

The Office of Victims' Rights subsequently filed an original application with this Court on N.G.'s behalf, arguing that the trial court erred in its interpretation of the psychotherapist-patient privilege.[24]

This Court agreed with the Office of Victims' Rights that the trial court had taken too narrow a view of the psychotherapist-patient privilege.[25]  We held that the protections of Evidence Rule 504(b) extend not only to "confidential communications" between a patient and their psychotherapist but also to "the psychotherapist's perceptions, theories, and conclusions pertaining to diagnosis and treatment when these perceptions, theories, and conclusions are based on information imparted to the psychotherapist through confidential communications."[26]  We also noted that the definition of "psychotherapist" under the rule was intended to be very broad and to encompass not only psychiatrists and psychologists, but also all licensed professional counselors, all licensed marital and family therapists, and "[any] person authorized to

---

[22]  *Id.* at 330 (alterations in original).

[23]  *Id.*

[24]  *Id.* at 328, 330; *see also* Brief of Petitioner at 6, 29-32, *N.G. v. Superior Court*, 291 P.3d 328 (Alaska App. 2012) (No. A-11049), 2011 WL 13383948, at *6, *30-32.

[25]  *N.G.*, 291 P.3d at 331-34.

[26]  *Id.* at 332.

practice medicine . . . while engaged in the diagnosis or treatment of a mental or emotional condition, including alcohol or drug addiction."[27]

We therefore concluded that the trial court erred when it assumed that the requested mental health and alcohol treatment records would contain significant amounts of non-privileged information.[28]  Instead, it was likely that virtually all of the requested records would qualify as privileged.[29]

We then turned to the larger question of whether, and under what circumstances, a witness's interests in the confidentiality of their privileged mental health information must yield to a defendant's constitutional right to confrontation.[30]  We noted that the majority of other jurisdictions that have considered this issue have held that "if the defendant makes a sufficient preliminary showing, the defendant is entitled to have the trial court conduct an *in camera* inspection of a government witness's mental health records."[31]  These jurisdictions have likewise held that a "witness's psychotherapist-patient privilege can be overridden if the trial court concludes that portions of those records are sufficiently relevant to the defendant's guilt or innocence, or are sufficiently relevant to the witness's credibility."[32]

We concluded, however, that we did not need to resolve this question in *N.G.* because, even assuming that we would follow the majority of jurisdictions in holding that the psychotherapist-patient privilege could be overridden under certain

---

[27]  *Id.* at 331 (alteration and omission in original).

[28]  *Id.* at 334.

[29]  *Id.*

[30]  *Id.* at 335-40.

[31]  *Id.* at 337.

[32]  *Id.*

circumstances, the defendant in *N.G.* had failed to make even the minimal preliminary showing that would be required.[33]  We described this minimal showing as the standard we adopted in *Booth v. State*.[34]

In *Booth*, we addressed the question of what type of showing was required to grant a defendant's request for *in camera* review of law enforcement personnel records, which are confidential under Alaska law.[35]  We held that a defendant would be entitled to this type of review if:

> the defendant identifies a type of information that would be relevant to the defendant's guilt or innocence (in light of the facts of the case, the State's theory of prosecution, and the defendant's theory of defense), and if this type of information is the kind of information that would be recorded in a police officer's personnel file.[36]

We further held that if, during the *in camera* review, the court discovered that the personnel file did contain information relevant to the defendant's guilt or innocence, then the court should turn that information over to the defense.[37]  We emphasized, however, that a defendant must support the motion for *in camera* review "with more than conclusory statements or unsupported assertions."[38]

___

[33]  *Id.* at 338.

[34]  *Id.* (discussing *Booth v. State*, 251 P.3d 369, 374 (Alaska App. 2011)).

[35]  *Booth*, 251 P.3d at 373-78.

[36]  *Id.* at 374 (citing *Dana v. State*, 623 P.2d 348 (Alaska App. 1981)); *see also People v. Gissendanner*, 399 N.E.2d 924 (N.Y. 1979).

[37]  *Booth*, 251 P.3d at 374.

[38]  *Id.* at 376.  Similarly, Alaska Criminal Rule 42(b)(2) requires that a motion must be supported by "a detailed statement of material facts which can be proved by the [moving]
(continued...)

In *N.G.*, we held that the defendant had failed to meet the *Booth* test because the defendant's offer of proof was too speculative.[39]  That is, the defendant did not provide a sufficient evidentiary basis for concluding that persons who have experienced an alcoholic blackout at some point in the past, or who have a history of bipolar disorder, are therefore "more likely to hallucinate or fundamentally misperceive events, or are more likely to be unable to discern truth from fiction in their later recounting of events."[40]  We therefore reversed the trial court's order granting *in camera* review of "every health care provider from whom [N.G.] had ever sought medical treatment, psychiatric care or psychological counseling, or alcohol counseling or treatment."[41]

> *Why we conclude that the superior court erred in ruling that* <u>N.G.</u> *precluded any* <u>in camera</u> *review of R.D.'s guardianship file*

In the current case, the superior court denied Douglas's renewed motion for *in camera* review of the neuropsychological records in R.D.'s guardianship file because the court read *N.G.* as precluding any such review.  We agree with Douglas that this was error.  As just explained, we did not resolve in *N.G.* whether, and under what circumstances, *in camera* review of privileged mental health documents should occur under Alaska law because the defendant in *N.G.* did not even meet the *Booth* standard required for *in camera* review of merely confidential documents.

---

[38]  (...continued)
party."

[39]  *N.G.*, 291 P.3d at 338-40.

[40]  *Id.*

[41]  *Id.* at 329, 340.

Here, in contrast to *N.G.*, Douglas did put forward an offer of proof that was more than sufficient to meet the *Booth* relevancy standard. Certainly by the time of the renewed motion at trial, it was clear that R.D.'s guardianship file would likely contain information that was relevant to R.D.'s ability to accurately perceive, recount, and/or recall the events in dispute and that this information could be directly relevant to the defense attorney's ability to effectively cross-examine R.D. at trial.

This case therefore requires us to resolve the legal questions we left open in *N.G.* — namely, whether there are circumstances under which a witness's psychotherapist-patient privilege must yield to a defendant's constitutional rights and, if so, what type of showing a defendant must make to obtain *in camera* review of such privileged information.

*Why we conclude that the psychotherapist-patient privilege must, under certain circumstances, yield to a defendant's constitutional rights*

On appeal, the State urges us to hold that Alaska's psychotherapist-patient privilege presents an absolute bar to disclosure in criminal cases.

In support of this argument, the State cites to *Jaffee v. Redmond*.[42] In *Jaffee*, the United States Supreme Court held that a civil plaintiff was not entitled to discovery of statements that a police officer made to a licensed social worker because those statements were protected by the federal psychotherapist-patient privilege.[43] In reaching this holding, the Court emphasized that the psychotherapist-patient privilege was protective of both a patient's privacy interests and the public good.[44] The Court

---

[42] *Jaffee v. Redmond*, 518 U.S. 1 (1996).

[43] *Id.* at 4-5, 18.

[44] *Id.* at 11.

explained that "[e]ffective psychotherapy . . . depends upon an atmosphere of confidence and trust" and therefore "the mere possibility of disclosure may impede development of the confidential relationship necessary for successful treatment."[45]  The Court further explained that "[t]he psychotherapist privilege serves the public interest by facilitating the provision of appropriate treatment for individuals suffering the effects of a mental or emotional problem" and that "[t]he mental health of our citizenry, no less than its physical health, is a public good of transcendent importance."[46]

In dicta, the *Jaffee* Court seemingly rejected a balancing approach that would have weighed the various interests at stake and allowed disclosure under certain circumstances.  Instead, the Court opined that "[a]n uncertain privilege, or one which purports to be certain but results in widely varying applications by the courts, is little better than no privilege at all."[47]  The Court declined, however, to hold that the privilege was absolute, concluding that "it [was] neither necessary nor feasible to delineate its full contours in a way that would 'govern all conceivable future questions in this area.'"[48]

We consider *Jaffee* to be of only marginal relevance to the current case. *Jaffee* is a civil case, and, as such, it does not involve a criminal defendant's constitutional rights.[49]  Indeed, many federal and state courts have declined to extend the

---

[45]  *Id.* at 10.

[46]  *Id.* at 11.

[47]  *Id.* at 18 (quoting *Upjohn Co. v. United States*, 449 U.S. 383, 393 (1981)).

[48]  *Id.* (quoting *Upjohn*, 449 U.S. at 386).  The Court also recognized that there probably were circumstances where the privilege must yield: "we do not doubt that there are situations in which the privilege must give way, for example, if a serious threat of harm to the patient or to others can be averted only by means of a disclosure by the therapist."  *Id.* at 18 n.19.

[49]  *See* U.S. Const. amend. V, VI, XIV; Alaska Const. art. I, § 11; *cf. Davis v. Alaska*, 415

(continued...)

*Jaffee* reasoning into the criminal context for that reason.[50]   Instead, these courts have applied a balancing approach to this issue and have held that there will be circumstances where the psychotherapist-patient privilege must yield to a defendant's due process right to present a defense as well as a defendant's constitutional rights to confrontation, cross-examination, and compulsory process.[51]

---

[49]   (...continued)
U.S. 308 (1974) (holding that a state's interest in the confidentiality of juvenile records must yield to a criminal defendant's Sixth Amendment right to confront the witnesses against them).

[50]   *See, e.g.*, *Bassine v. Hill*, 450 F. Supp. 2d 1182, 1185-86 (D. Or. 2006) (distinguishing *Jaffee* and concluding that criminal defendant's constitutional rights outweighed privacy interest in psychotherapy records); *United States v. Mazzola*, 217 F.R.D. 84, 88-89 (D. Mass. 2003) (declining to extend *Jaffee* to criminal case and holding that societal interests in guarding the confidentiality of communications between a therapist and client were outweighed by a criminal defendant's constitutional right to effectively prepare and cross-examine a witness); *United States v. Hansen*, 955 F. Supp. 1225, 1226 (D. Mont. 1997) (holding that a criminal defendant's demonstrated need for the records outweighed the witness's privilege, and noting that this was "consistent with the *Jaffee* Court's intent that the precise contours of the privilege be developed in specific cases"); *State v. Fay*, 167 A.3d 897, 909 (Conn. 2017) (holding that "the balance of equities in criminal cases involving the psychiatrist-patient privilege of a homicide victim is significantly different than in civil cases like *Jaffee*" and concluding that a criminal defendant is entitled to *in camera* review if they can establish a compelling need); *Commonwealth v. Barroso*, 122 S.W.3d 554, 558 (Ky. 2003) (noting that, unlike in *Jaffe*, balancing of interests in criminal cases involves defendant's constitutional rights); *State v. Johnson*, 102 A.3d 295, 303-06 (Md. 2014) (distinguishing *Jaffee* and holding that the victim's right to assert a privilege may, under certain circumstances, have to yield to the criminal defendant's constitutional rights at trial).

[51]   *See, e.g.*, *D.P. v. State*, 850 So. 2d 370, 374 (Ala. Crim. App. 2002); *State v. Slimskey*, 779 A.2d 723, 731-32 (Conn. 2001); *Burns v. State*, 968 A.2d 1012, 1024-25 (Del. 2009); *Bobo v. State*, 349 S.E.2d 690, 692 (Ga. 1986); *State v. Peseti*, 65 P.3d 119, 128 (Haw. 2003); *Barroso*, 122 S.W.3d at 563; *Commonwealth v. Dwyer*, 859 N.E.2d 400, 415-16 (Mass. 2006); *People v. Stanaway*, 521 N.W.2d 557, 575 (Mich. 1994); *State v. Hummel*, 483

(continued...)

Thus, for example, in *Bobo v. State*, the Georgia Supreme Court held that "when the privilege of a witness stands in the way of the defendant's right to confront the witnesses against him, then, upon a proper showing by the defendant, the balance must be tipped in favor of his constitutional rights and the search for the truth."[52] Likewise, in *State v. Peseti*, the Hawai'i Supreme Court held that "when a statutory privilege interferes with a defendant's constitutional right to cross-examine, then, upon a sufficient showing by the defendant, the witness' statutory privilege must, in the interest of the truth-seeking process, bow to the defendant's constitutional rights."[53] Similarly, in *Commonwealth v. Barroso*, the Kentucky Supreme Court held that "[i]f the psychotherapy records of a crucial prosecution witness contain evidence probative of the witness's ability to recall, comprehend, and accurately relate the subject matter of the testimony, the defendant's right to compulsory process must prevail over the witness's psychotherapist-patient privilege."[54] And in *People v. Stanaway*, the Michigan Supreme

_____

[51] (...continued)
N.W.2d 68, 71-72 (Minn. 1992); *State v. King*, 34 A.3d 655, 657-58 (N.H. 2011); *State v. L.J.P.*, 637 A.2d 532, 536-37 (N.J. Super. App. Div. 1994); *State v. Gonzales*, 912 P.2d 297, 299-302 (N.M. App. 1996); *People v. Acklin*, 424 N.Y.S.2d 633, 636 (N.Y. Sup. 1980); *State v. Middlebrooks*, 840 S.W.2d 317, 332-33 (Tenn. 1992), *superseded on other grounds by statute*, Tenn. L. Pub. 1995 ch. 377, § 1; *State v. Blake*, 63 P.3d 56, 61-62 (Utah 2002); *State v. Kalakosky*, 852 P.2d 1064, 1077-78 (Wash. 1993); *State v. Green*, 646 N.W.2d 298, 304-10 (Wis. 2002). We note that there are also two jurisdictions (California and Maryland) that allow *in camera* review and disclosure of privileged mental health records *at trial* upon a sufficient defense showing, but otherwise reject pretrial discovery of such privileged materials. *See People v. Hammon*, 938 P.2d 986, 992-93 (Cal. 1997); *Goldsmith v. State*, 651 A.2d 866, 873 (Md. 1995).

[52] *Bobo v. State*, 349 S.E.2d 690, 692 (Ga. 1986).

[53] *State v. Peseti*, 65 P.3d 119, 128 (Haw. 2003).

[54] *Commonwealth v. Barroso*, 122 S.W.3d 554, 563 (Ky. 2003).

Court held, "The state's interest in preserving the confidentiality of the social worker, diversion, and rape-counseling records must yield to a criminal defendant's due process right to a fair trial when the defendant can show that those records are likely to contain information necessary to his defense."[55]

Having reviewed the relevant case law from other jurisdictions, we conclude that the reasoning from the courts permitting *in camera* review of privileged mental health records under certain circumstances is more persuasive than the approach followed by the handful of jurisdictions that treat their evidentiary privileges as an absolute bar to any disclosure.[56]  Accordingly, we now formally join the majority of

---

[55]  *People v. Stanaway*, 521 N.W.2d 557, 575 (Mich. 1994).

[56]  On appeal, the State cites to cases from three jurisdictions (Pennsylvania, Colorado, and Illinois) that it asserts treat their evidentiary privilege as absolute.  *See Commonwealth v. Wilson*, 602 A.2d 1290 (Pa. 1992) (holding a statutory rape victim-counselor privilege to be absolute); *People v. District Court*, 719 P.2d 722, 727 & n.3 (Colo. 1986) (holding the psychotherapist-patient privilege absolute and rejecting the "balancing test" that other jurisdictions use); *People v. Foggy*, 500 N.E.2d 1026, 1031-32 (Ill. App. 1986), *aff'd*, 521 N.E.2d 86 (Ill. 1988) (upholding a facial and as-applied constitutional challenge to a statutory rape victim-counselor privilege that the legislature intended to be absolute).

As an initial matter, we question the inclusion of Illinois in this list.  The State cites to an Illinois Supreme Court case, *People v. Foggy*, in support of its claim that the psychotherapist-patient privilege is absolute under Illinois law.  But, in that case, the Illinois Supreme Court fell short of declaring its statutory rape victim-counselor privilege absolute and instead held only that the defendant's particular showing was inadequate.  *See Foggy*, 521 N.E.2d at 91-92 (affirming the denial of an *in camera* review but emphasizing that the defense request was "merely general").  Moreover, *Foggy* involved a specific Illinois statute that created an absolute statutory privilege for rape victim counselors; it did not involve the general psychotherapist-patient privilege that applies to other types of mental health records.  *See id.* at 87.  Indeed, there are Illinois cases, some of which post-date *Foggy*, that suggest that a defendant in Illinois is entitled to an *in camera* review of mental health records if the defendant "sufficiently show[s] that the requested records are material and relevant to the witness's credibility."  *People v. Graham*, 947 N.E.2d 294, 300 (Ill. App. 2011) (quoting

(continued...)

courts in holding that Alaska's psychotherapist-privilege must, under certain circumstances, yield to a criminal defendant's constitutional rights, and thus, upon a sufficient preliminary showing, a defendant is entitled to *in camera* review of otherwise privileged mental health records. We turn next to the question of what that preliminary showing should entail.

*The standard that applies to a defendant's request for <u>in camera</u> review of privileged mental health records*

In *N.G. v. Superior Court*, we suggested that the standard that must be met to obtain *in camera* review of privileged mental health records should be higher than the standard used in *Booth* to obtain *in camera* review of a police officer's confidential personnel file, given the enhanced privacy concerns associated with a person's mental health records.[57] We now formally adopt this suggestion, holding that the standard should be higher, particularly because the defense request will often be for the alleged victim's mental health records. We note that under Article I, Section 24 of the Alaska Constitution, crime victims have the right "to be treated with dignity, respect, and fairness during all phases of the criminal . . . process." The Alaska Victims' Rights Act

---

[56] (...continued)
*People v. K.S.*, 900 N.E.2d 1275, 1278 (Ill. App. 2008)); *see also People v. Dace*, 449 N.E.2d 1031 (Ill. App. 1983).

We also note that the Pennsylvania psychotherapist-patient privilege is statutory and does not include any exceptions. *See* 42 Pa. Cons. Stat. § 5944 (stating that "[t]he confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client"). In contrast, the Alaska psychotherapist-patient privilege is rule-based and includes a number of already established exceptions. *See* Alaska R. Evid. 504(d) (enumerating different exceptions to the psychotherapist-patient privilege including when "the condition of the patient is an element of the claim or defense of the patient").

[57] *N.G. v. Superior Court*, 291 P.3d 328, 338 (Alaska App. 2012).

likewise contains several provisions that are specifically intended to "protect victims of . . . crime from risk of harassment, intimidation, and unwarranted invasion of privacy."[58] It is therefore necessary to craft a standard that takes full account of the competing constitutional rights at stake.[59]

In *Booth*, we held that a defendant was entitled to *in camera* review of a police officer's confidential personnel records based primarily upon a showing of possible relevancy. Under *Booth*, "the defendant need only show that *if* the requested personnel files contain the sort of information described in the defendant's motion, this information would be relevant to the defendant's guilt or innocence (given the facts of the case, the State's theory of prosecution, and the defendant's theory of defense)."[60] In addition, to prevent defendants from engaging in whole-scale fishing expeditions, the defendant "must present a factual predicate for their discovery request — either pointing to facts already within the record, or making an offer of proof that provides the evidentiary foundation for the request."[61]

In contrast, to obtain *in camera* review of otherwise privileged records, most jurisdictions require a defendant to show more than just the *possibility* that the records might contain *relevant* information. Instead, defendants must generally show something akin to a "reasonable probability," "reasonable belief," or a "reasonable likelihood" that the records will contain evidence that is "exculpatory" or "necessary to

---

[58] AS 12.61.100.

[59] *See N.G.*, 291 P.3d at 340-41 (Bolger, J., concurring) (noting Article I, Section 24 and concluding that "a healthy construction of [the psychotherapist-patient] privilege is necessary to avoid infringing on privacy interests protected by the constitution").

[60] *Booth v. State*, 251 P.3d 369, 375 (Alaska App. 2011).

[61] *Id.* at 377.

a determination of guilt or innocence" or "material information necessary to the defense."

Below is a representative sample of the various tests that defendants in different jurisdictions must meet in order to obtain *in camera* review of otherwise privileged mental health records.

> Connecticut: The defendant must make a preliminary showing that "there is a reasonable ground to believe that the failure to produce the records would likely impair his right to impeach the witness."[62]
>
> Hawai'i: The defendant must demonstrate that "(1) there is a legitimate need to disclose the protected information; (2) the information is relevant and material to the issue before the court; and (3) the party seeking to pierce the privilege shows by a preponderance of the evidence that no less intrusive source for that information exists."[63]
>
> Kentucky: The defendant must establish "a reasonable belief that the records contain exculpatory evidence."[64]
>
> Maryland: The defendant must establish "a reasonable likelihood that the privileged records contain exculpatory information necessary for a proper defense."[65]
>
> Michigan: The defendant must make a showing of a "good-faith belief, grounded on some demonstrable fact, that there

---

[62] *State v. Peeler*, 857 A.2d 808, 841 (Conn. 2004) (quoting *State v. Slimskey*, 779 A.2d 723, 732 (Conn. 2001)).

[63] *State v. Peseti*, 65 P.3d 119, 129 (Haw. 2003) (quoting *State v. L.J.P.*, 637 A.2d 532, 537 (N.J. Super. App. Div. 1994)).

[64] *Commonwealth v. Barroso*, 122 S.W.3d 554, 564 (Ky. 2003).

[65] *Goldsmith v. State*, 651 A.2d 866, 877 (Md. App. 1995); *see also State v. Johnson*, 102 A.3d 295, 299 (Md. 2014).

is a reasonable probability that the records are likely to contain material information necessary to the defense."[66]

New Hampshire: The defendant must establish "a reasonable probability that the records contain information that is material and relevant to his defense."[67]

Utah: The defendant must show "with reasonable certainty that exculpatory evidence exists which would be favorable to [the] defense."[68]   (Note that "reasonable certainty" in this context is defined as resting between a "reasonable probability" and "more likely than not."[69])

Wisconsin: The defendant must "set forth, in good faith, a specific factual basis demonstrating a reasonable likelihood that the records contain relevant information necessary to a determination of guilt or innocence and is not merely cumulative to other evidence available to the defendant."[70]

---

[66]   *People v. Stanaway*, 521 N.W.2d 557, 574 (Mich. 1994).

[67]   *State v. King*, 34 A.3d 655, 658 (N.H. 2011) (quoting *State v. Gagne*, 612 A.2d 899, 901 (N.H. 1992)); *see also* Iowa Code § 622.10(4)(a)(2)(a) (requiring defendant to show "a reasonable probability that the information sought is likely to contain exculpatory information").

[68]   *State v. Blake*, 63 P.3d 56, 61 (Utah 2002) (alteration in original) (quoting *State v. Cardall*, 982 P.2d 79, 85 (Utah 1999)).  We note that Utah has a separate standard that applies to the *in camera* review once the records have been obtained.  In conducting the *in camera* review, the trial court is required to use a "reasonable probability" standard to decide which of the privileged records are "material" to the defendant's defense and should therefore be disclosed.  Under this standard, evidence is deemed "material" and must be disclosed where "there is a reasonable probability that, if the evidence is disclosed to the defense, the result of the proceeding will be different." *Id.* at 62.

[69]   *Id.* at 61.

[70]   *State v. Green*, 646 N.W.2d 298, 310 (Wis. 2002).

Despite the slight differences in how these standards are described, they all appear to operate similarly in practice.

For example, all of the standards require a defendant to do more than make a general request for *in camera* review based on the fact that the victim or witness has been in counseling or might have a mental illness.[71] In *State v. Blake*, for example, the defendant argued that the victim's mental health records were "important" because they might have information about "whether she has recanted or not" during the counseling.[72] The defendant also speculated that the records might contain information about "medication she's taking that effect [sic] her credibility" or that the victim "may have a mental illness where part of the diagnosis is chronic lying."[73]

The Utah Supreme Court held that this showing was insufficient to justify *in camera* review, noting that the situation "differs markedly from cases where a criminal defendant can point to information from outside sources suggesting that a victim has

---

[71] *See, e.g.*, *State v. Fay*, 167 A.3d 897, 914 (Conn. 2017) (defendant's claim that victim suffered from depression and attended psychiatric counseling insufficient to justify *in camera* review because "the mere existence of a mental condition, without any showing of relevance, will not suffice to justify intrusion into the victim's privileged medical records"); *State v. Johnson*, 102 A.3d 295, 309 (Md. 2014) (noting that a "speculative assertion that the records might be relevant for impeachment" is insufficient to justify *in camera* review (quoting *Goldsmith v. State*, 651 A.2d 866, 877 (Md. App. 1995))); *State v. Gonzales*, 912 P.2d 297, 302 (N.M. App. 1996) ("A general assertion that inspection of the records is needed for a possible attack on the victim's credibility is insufficient to meet [the] threshold showing."); *Blake*, 63 P.3d at 61-62 (holding that the defendant's "mere speculation" that the victim's counseling records might have contained exculpatory evidence was "clearly not enough to warrant *in camera* review").

[72] *Blake*, 63 P.3d at 61-62.

[73] *Id.*

recanted or accused another of the crime alleged or has a history of mental illness relevant to the victim's ability to accurately report on the assault."[74]

Later in its opinion, the supreme court provided additional guidance regarding what type of showing would justify an *in camera* review under the Utah "reasonable certainty" standard:

> At a minimum, specific facts must be alleged. These might include references to records of only certain counseling sessions, which are alleged to be relevant, independent allegations made by others that a victim has recanted, or extrinsic evidence of some disorder that might lead to uncertainty regarding a victim's trustworthiness.[75]

The Kentucky Supreme Court has likewise declared that "[a] person's credibility is not in question merely because he or she is receiving treatment for a mental health problem."[76] Indeed, "[t]o subject every witness in a criminal prosecution to an in camera review of their psychotherapist's records would be the invasion of privacy which the psychotherapist-patient privilege is intended to prevent."[77]

At the same time, the supreme court recognized that "[c]ertain forms of mental disorder have high probative value on the issue of credibility."[78] Thus, for example, if a defendant had a good-faith factual basis for believing that the victim may suffer from hallucinations or delusions, such a showing would be sufficient to obtain *in*

---

[74] *Id.* at 62.

[75] *Id.*

[76] *Commonwealth v. Barroso*, 122 S.W.3d 554, 563 (Ky. 2003) (quoting *People v. Pack*, 201 Cal. App. 3d 679, 248 Cal. Rptr. 240, 244 (Cal. App. 1988)).

[77] *Id.* (quoting *Pack*, 248 Cal. Rptr. at 244).

[78] *Id.* at 562 (quoting *United States v. Lindstrom*, 698 F.2d 1154, 1160 (11th Cir.1983)).

*camera* review under Kentucky law.[79]   Other jurisdictions have followed similar reasoning.[80]

On appeal, the State argues that this Court should adopt a higher standard for permitting *in camera* review than that recognized by the majority of jurisdictions. Specifically, the State contends that the standard should be the same as that which applies to a defendant's request for a court-ordered psychiatric evaluation of the alleged victim.

In *Pickens v. State*, we held that a court should order a psychiatric examination of a victim only if "the circumstances indicate a necessity for an examination."[81]   We further explained,

> Such necessity would generally arise only if little or no corroboration supported the charge and if the defense raised the issue of the effect of the complaining witness' mental or emotional condition upon her veracity.[82]

---

[79]   *Id.* at 562-63.

[80]   *See, e.g.*, *State v. Peeler*, 857 A.2d 808, 842 (Conn. 2004) (*in camera* review justified where witness diagnosed with significant mental disorders, including cocaine induced psychiatric disorder with hallucinations; chronic paranoid schizophrenia; drug induced psychosis while using cocaine, and antisocial personality disorder); *People v. Stanaway*, 521 N.W.2d 557, 576-77 (Mich. 1994) (*in camera* review justified where defendant claimed victim was a "troubled, maladjusted child whose past trauma had caused her to make a false accusation" and defendant pointed to prior abuse by biological father and factual support showing sexually aggressive behavior by the victim); *State v. Pandolfi*, 765 A.2d 1037, 1043 (N.H. 2000) (*in camera* review of counseling records justified to determine what medication, if any, the witness was taking after witness testified that she may have been confused about certain dates because of the medication she was taking in connection with her counseling).

[81]   *Pickens v. State*, 675 P.2d 665, 668 (Alaska App. 1984) (quoting *Ballard v. Superior Court*, 410 P.2d 838, 849 (Cal. 1966)).

[82]   *Id.* (quoting *Ballard*, 410 P.2d at 849).

Moreover, to sufficiently raise the issue of the victim's mental or emotional condition, it would be incumbent on the defendant to make "a specific showing" of "good cause to believe" that (1) the victim's ability to perceive events accurately or to relate those events truthfully was substantially impaired; and (2) this impairment was of such a nature that a psychological evaluation would be likely to confirm its existence or to provide material information as to its scope.[83]

The *Pickens* standard shares some commonalities with the standards used in other jurisdictions to obtain *in camera* review of a victim's privileged mental health records. Like those standards, it requires a good faith factual basis — *i.e.*, a "specific showing" and it relies on a similar concept of constitutional "necessity."

But the *Pickens* standard is nevertheless more stringent, because ordering a victim to undergo a court-ordered psychiatric examination is significantly more intrusive than an *in camera* review of already-existing mental health records. The *Pickens* standard is also inapposite because it does not address other types of exculpatory evidence — such as a recantation — that may exist in a victim's mental health records.

Accordingly, we reject the State's suggestion that we should adopt the *Pickens* standard as the proper standard to evaluate a defense request for *in camera* review of a victim or witness's privileged mental health records. Instead, we adopt a standard that is similar to the ones used by the majority of other jurisdictions. Under this standard, a defense request for *in camera* review of privileged mental health records should be granted if the defendant has shown a reasonable likelihood that the records will contain exculpatory evidence that is necessary to the defense and unavailable from a less intrusive source.

---

[83] *Id.* at 669.

Like the standards used in other jurisdictions, this standard is intended to protect both the privilege and a defendant's constitutional rights. As one commentator has noted, "Requiring a defendant to allege a good faith factual basis in his request for privileged records poses a significant hurdle to a defendant who seeks records merely as an intimidation tactic, reduces the disclosure of records in 'fishing expeditions,' and protects both the victim's privacy rights and the privilege."[84]

We also emphasize that this standard is the *preliminary* showing that a defendant must meet to obtain *in camera* review of privileged mental health records. Like most other jurisdictions, we hold that the trial court may only disclose those records containing information that qualifies as *materially* exculpatory under the facts of that case. As a general matter, evidence is deemed material when it "might have led the jury to entertain a reasonable doubt about the defendant's guilt."[85]

As other jurisdictions have recognized, there are distinct advantages to requiring an initial *in camera* review, rather than requiring disclosure directly to the defendant or the defendant's attorney.[86] First, an *in camera* review is significantly less intrusive than such disclosure would be. Indeed, as the Connecticut Supreme Court has explained:

---

[84]   Jennifer L. Hebert, Note, *Mental Health Records in Sexual Assault Cases: Striking a Balance to Ensure a Fair Trial for Victims and Defendants*, 83 Tex. L. Rev. 1453, 1477 (2005).

[85]   *Williams v. State*, 629 P.2d 54, 64 (Alaska 1981).

[86]   *See, e.g.*, *State v. Green*, 646 N.W.2d 298, 310 (Wis. 2002); *State v. Peseti*, 65 P.3d 119, 132-34 (Haw. 2003); *Stanaway*, 521 N.W.2d at 575; *see also March v. State*, 859 P.2d 714, 717 (Alaska App. 1993) (noting that *in camera* review of confidential materials is "the proper procedure for safeguarding a criminal defendant's due process rights to discovery of exculpatory information").

An *in camera* review is a relatively modest intrusion into a victim's mental health history, and that narrow exception to the psychiatrist-patient privilege — an exception available only when the court finds it clearly necessary in order to safeguard the accused's fair trial rights — is unlikely to prove any more of a deterrent to persons seeking mental health treatment than that already attributable to existing statutory exceptions.[87]

Second, an *in camera* review has the benefit of creating a record for any future appellate review. This provides an additional safeguard in cases where the trial court grants the *in camera* review but ultimately does not disclose any of the privileged material.

For these reasons, some jurisdictions have encouraged trial courts to err on the side of granting *in camera* review in close cases, while still emphasizing the need for stringency with regard to the decision of what to disclose following the *in camera* review. As the Wisconsin Supreme Court has advised trial courts,

Our standard is not intended . . . to be unduly high for the defendant before an in camera review is ordered by the circuit court. The defendant, of course, will most often be unable to determine the specific information in the records. Therefore, in cases where it is a close call, the circuit court should generally provide an in camera review. We have confidence in the circuit courts to then make a proper determination as to whether disclosure of the information is necessary based on the competing interests involved in such cases.[88]

We recognize the burden that *in camera* review places on trial courts, who generally lack complete information about the facts of the case and may therefore fail to

---

87    *State v. Fay*, 167 A.3d 897, 909-10 (Conn. 2017).

88    *Green*, 646 N.W.2d at 310 (citations omitted).

recognize the significance (or insignificance) of particular information to the defense.[89] Because of these difficulties, there is at least one jurisdiction — Massachusetts — that eschews the use of *in camera* reviews altogether. Under Massachusetts law, a defendant must make a preliminary showing of necessity similar to the preliminary showing required by other jurisdictions to obtain production of statutorily privileged records.[90] However, unlike in other jurisdictions, once those records have been produced, they are given directly to the defense attorney who is allowed to review them for exculpatory evidence under a strict protective order that precludes the attorney from copying the records or disclosing their contents to anyone else, including the defendant, until expressly permitted to do so by the trial court.[91] The Massachusetts Supreme Judicial Court adopted this unique protocol because it concluded that "[t]he absence of an advocate's eye may have resulted in overproduction, as well as underproduction, of privileged records, and has repeatedly contributed to trial delays and appeals, jeopardizing the rights of defendants, complainants, and the public."[92]

Douglas does not request that we adopt a protocol similar to the one used in Massachusetts. Nor are we inclined to do so. Despite the burden that an *in camera* review can place on trial courts, we believe that it remains the best method for striking the appropriate balance between the competing interests at stake.

We nevertheless remind defense attorneys of the need to provide the court with an overview of the facts of the case, the State's theory of prosecution, the defendant's theory of defense, and the reasons why the exculpatory evidence (if it exists)

---

[89] *See, e.g.*, *Commonwealth v. Dwyer*, 859 N.E.2d 400, 418 (Mass. 2006).

[90] *Id.* at 418-19.

[91] *Id.* at 419, 422.

[92] *Id.* at 418.

would be material to the determination of guilt or innocence.[93]   Such information is important not only to establish the preliminary showing required to obtain *in camera* review, but also to educate the trial court about the case for the later *in camera* review.

We also advise trial courts that, in some circumstances, the full exculpatory value of certain records may not be clear until after the witness has testified at trial and more is known about the case and the witness.  Trial courts should therefore be aware that the duty to disclose is an ongoing duty that continues through trial.[94]  Courts should also be receptive to any renewed requests for *in camera* review that may be based on new information learned at trial (as occurred in this case).

Lastly, we note that there are some jurisdictions that leave the ultimate decision of whether the privilege should be breached to the privilege holder — *i.e.*, to the witness whose privileged records are being sought.[95]  Thus, in these jurisdictions, if a

---

[93]   *See Green*, 646 N.W.2d at 310 ("In creating this standard, we intend to place the burden on the defendant to reasonably investigate information related to the victim before setting forth an offer of proof and to clearly articulate how the information sought corresponds to his or her theory of defense.").

[94]   *Cf. Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ("[T]he duty to disclose [material, privileged investigative records] is ongoing; information that may be deemed immaterial upon original examination may become important as proceedings progress, and the court would be obligated to release information material to the fairness of the trial.").  We note that the judge who presides over the trial will need to have conducted their own *in camera* review of the privileged materials if they were not the judge who handled the issue during the pretrial proceedings.

[95]   *See, e.g., State v. Slimskey*, 779 A.2d 723, 731-32 (Conn. 2001) (holding that the witness's testimony will be stricken if the witness refuses to consent to an *in camera* inspection of their records after defendant has made a sufficient preliminary showing and that the witness's testimony will also be stricken if the witness refuses to allow disclosure of records that are found to be "especially probative of the witness' capacity to relate the truth or to observe, recollect and narrate relevant occurrences"); *People v. Stanaway*, 521 N.W.2d

(continued...)

defendant is successful at making the preliminary showing, the trial court must then obtain a limited waiver from the witness before obtaining the records and conducting the *in camera* review.[96] An additional waiver is also required before any exculpatory evidence discovered during the *in camera* review can be disclosed to the parties.[97] If the witness refuses to waive the privilege, the witness is precluded from testifying — or, if the witness has already testified, the testimony is stricken from the record.[98]

Neither party has requested that we adopt this approach under Alaska law. The advantage of this approach is that it empowers the privilege holder (who is often the alleged victim) by giving them direct control over whether the privilege will be breached. However, other courts have criticized this approach as "unworkable" and "unwieldy" in practice.[99] This approach also means that the fate of the criminal prosecution often will ultimately rest in the hands of the witness or the alleged victim, a proposition that is

---

[95] (...continued)
557, 577 (Mich. 1994) ("Our ruling is that where the privilege is absolute if the complainant will not waive her statutory privilege and allow the in camera inspection after the defendant's motion has been granted, suppression of the complainant's testimony is the appropriate sanction."); *State v. Trammell*, 435 N.W.2d 197, 201 (Neb. 1989) (determining that "where the witness refuses to waive the privilege, the result is that the testimony of the witness is inadmissible because the defendant is prevented from full and . . . effective cross-examination of the witness"); *State v. Lynch*, 859 N.W.2d 125, 126-27 (Wis. App. 2014) (explaining that when the victim refused to release her records for an *in camera* review, the appropriate remedy was "the exclusion of the victim's testimony at trial").

[96] *Slimskey*, 779 A.2d at 732.

[97] *Id.*

[98] *Id.*

[99] *See Commonwealth v. Barroso*, 122 S.W.3d 554, 565 (Ky. 2003).

generally at odds with our legal traditions and current Alaska law.[100] Given these criticisms, we are unwilling to adopt such an approach here, particularly in the absence of any controlling legislative intent or a direct request to do so. We nevertheless emphasize that notice must be given to the privilege holder before any privileged records are obtained so that the privilege holder's position on their privilege can be determined and questions about the appropriate scope of the request and/or whether there are less intrusive sources for the requested information can be addressed.[101]

In sum, to obtain *in camera* review of privileged mental health records held by a third party, a defendant must show a reasonable likelihood that the records will contain exculpatory evidence and that there is no less intrusive source for this evidence.[102] If the defendant succeeds in this preliminary showing, the trial court shall order the production of the relevant records under seal and shall then conduct an *in camera* review of the records to determine whether the records actually contain exculpatory evidence — *i.e.*, evidence, including impeachment evidence, that is both favorable to the accused and material to the determination of guilt or innocence. If the *in camera* review reveals information that qualifies as both favorable and material in the

---

[100] *See Cooper v. District Court*, 133 P.3d 692, 700, 705 (Alaska App. 2006) (explaining that while crime victims in Alaska have various constitutional rights, including the right to attend all proceedings and provide input before certain decisions are made, they do not have the right to intervene in the litigation of a criminal case — that is, crime victims do not have a right to determine what charges should be brought, how those charges should be litigated or settled, or to control how appellate review should be sought).

[101] *See Spencer v. State*, 642 P.2d 1371, 1376 n.3 (Alaska App. 1982) ("We caution trial judges to make sure that the individuals involved in third party discovery, in fact, resist discovery by invoking their privilege before denying discovery on this ground. We also believe that a prosecutor may not ethically influence his witnesses to claim a privilege.").

[102] This assumes that the privilege holder has not waived their privilege.

context of that particular case, the court shall disclose that information to the parties with an appropriate protective order to prevent any further disclosures beyond those required to litigate the case. Any records that are not disclosed to the parties shall be kept under seal and remain in the record for any future appellate review. To facilitate this appellate review, we encourage the trial court to provide a written or oral explanation of its disclosure decision.[103] Such an explanation may be made under seal.

*Applying these principles to the current case*

In the current case, Douglas sought *in camera* review of neuropsychological reports in R.D.'s guardianship file. Most, if not all, of these reports were likely privileged under AS 13.26.241(b) and Alaska Evidence Rule 504(b) (the psychotherapist-patient privilege).[104]

The superior court denied Douglas's initial pretrial motion for *in camera* review on the ground that Douglas was just "speculating" that R.D. had a traumatic brain injury. The superior court subsequently denied Douglas's renewed mid-trial motion on the ground that *N.G.* precluded the court from ordering any *in camera* review of privileged records.

---

[103] *See Commonwealth v. Shaw*, 600 S.W.3d 233, 239 n.3 (Ky. 2020) ("We emphasize that trial courts should keep a detailed record of each step of this process, as appellate courts will need to know exactly what the trial court looked at and what the defense was eventually allowed to see, if anything.").

[104] We note that, to the extent that there is information in the records that is not privileged and instead merely confidential, the superior court should disclose that information if there is "good cause" to do so. *See* AS 13.26.021(a). The court should also refrain from disclosing any privileged material that would be cumulative of any confidential material already disclosed.

Douglas argues that the superior court erred when it refused to order *in camera* review of the relevant portions of R.D.'s guardianship file. We agree.

As an initial matter, the superior court likely erred in denying Douglas's pretrial motion. The existence of the guardianship was itself evidence that R.D. might have ongoing deficits in perceiving, remembering, and/or reporting information. To appoint a full guardian, a court must find, by clear and convincing evidence, that the person is "incapacitated" to such a degree that they are "totally without capacity to care for [their own needs]."[105] An "incapacitated person" is defined as:

> a person whose ability to receive and evaluate information or to communicate decisions is impaired for reasons other than minority to the extent that the person lacks the ability to provide the essential requirements for the person's physical health or safety without court-ordered assistance.[106]

This is not to say that the existence of a guardianship necessarily means that a defendant should automatically be granted *in camera* review of a person's guardianship file. We leave that question for another day.

Here, it is enough to say that it was certainly error for the superior court to deny Douglas's renewed mid-trial motion for *in camera* review once the trial testimony established that R.D. had an underlying condition — traumatic brain injury — that continued to affect her memory and may also have affected her ability to perceive and/or report information from the alleged assault. As we previously noted, the superior court

---

[105] *See* AS 13.26.251(b)-(c) & (f).

[106] AS 13.26.005(5).

made this erroneous ruling even after the prosecutor at trial made clear that he had no objection to an *in camera* review of the relevant documents.[107]

But this error does not necessarily entitle Douglas to a new trial. Instead, the error must be reviewed in light of the entire record to determine whether it was harmless beyond a reasonable doubt.[108] Whether such an error is harmless beyond a reasonable doubt in a particular case depends upon a host of factors, including:

> the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . If the evidence may have had a tendency to influence the judgment of the jury, it cannot be considered harmless.[109]

---

[107] As we have explained, the prosecutor who represented the State at trial was not the same prosecutor who represented the State during the earlier proceedings. The record shows that the trial prosecutor mistakenly assumed that an *in camera* review had already occurred.

[108] *See State v. Peeler*, 857 A.2d 808, 846 (Conn. 2004) (concluding that the error was harmless where the State established, beyond a reasonable doubt, that disclosure and use of the witness's mental health records would not "have had a tendency to influence the judgment of the jury" (quoting *State v. Rolon*, 777 A.2d 604, 617 (Conn. 2001))); *State v. Ballos*, 602 N.W.2d 117, 120-21 (Wis. App. 1999) (concluding that there was no reasonable possibility that the error contributed to the conviction where jury learned of witness's mental health problems and evidence of guilt was overwhelming); *State v. Middlebrooks*, 840 S.W.2d 317, 333 (Tenn. 1992), *superseded on other grounds by statute*, Tenn. L. Pub. 1995 ch. 377, § 1 (concluding that the error was harmless because *in camera* review of records established that the records "contained very little information probative of [the witness's] credibility").

[109] *Peeler*, 857 A.2d at 844 (quoting *Rolon*, 777 A.2d at 617); *see also Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986); *State v. Blackwell*, 801 S.E.2d 713, 728 (S.C. 2017).

Here, there are reasons to believe that the error might be harmless. Although Douglas's motions for *in camera* review of the guardianship file were denied, the jury was still made aware that R.D. had suffered a traumatic brain injury and had a guardian at the time of the incident. The jury was also made aware, through both R.D.'s and her mother's testimony, that the brain injury continued to affect R.D.'s memory, at least to some extent. In addition, although there was no eyewitness to the sexual assault in the elevator, there were multiple eyewitnesses to the immediate aftermath, during which Douglas continued to harass R.D. and act in a sexualized manner.

Ultimately, however, whether a new trial is required will depend on the results of the *in camera* review and the information it produces. Accordingly, we remand this case to the superior court so that the court can obtain the relevant portions of the guardianship file for *in camera* review.

Once the records are obtained, the superior court should subject them to an *in camera* review. The court should only disclose information from the records to the parties if the information qualifies as both favorable and material in the context of this particular case.[110]

---

[110] We note that, to the extent possible, the court's disclosure order should be tailored to the time periods that are directly relevant to this case — *i.e.*, the time period around the original incident and the time period before trial. *See State v. Storlazzi*, 464 A.2d 829, 833 (Conn. 1983) (holding that defendant should be granted access to records bearing on "the mental unsoundness of a witness (i.e., relating to a trait importing in itself a defective power of observation, recollection or communication), at or around the time of trial or of the occurrence about which he is to testify" (quoting *State v. Piskorski*, 419 A.2d 866, 895 (Conn. 1979))). Additional records should only be disclosed if the records from the relevant time periods cannot be understood without them.

As previously explained, evidence is generally deemed material if it "might have led the jury to entertain a reasonable doubt about the defendant's guilt."[111] "Material evidence" is also sometimes defined as any evidence where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."[112] (A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome."[113]) These definitions are sometimes criticized as "backward-looking" and difficult to apply except in the appellate context. But, on remand, the superior court in this case will be in the unique position of evaluating materiality in the context of a trial that is already complete and fully transcribed. The superior court is therefore better positioned than most trial courts to determine the materiality of any favorable evidence that the records may include.

Thus, if the *in camera* review reveals evidence that qualifies as both favorable and material, the superior court shall disclose that evidence to the parties and allow the parties to brief the question of whether non-disclosure of this information was

---

[111] *Williams v. State*, 629 P.2d 54, 64 (Alaska 1981).

[112] *Pennsylvania v. Ritchie*, 480 U.S. 39, 57 (1987) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985) (opinion of Blackmun, J.)); *see also State v. Blake*, 63 P.3d 56, 62 (Utah 2002); *Storlazzi*, 464 A.2d at 834 ("The test of materiality is whether the omitted evidence, evaluated in the context of the entire record, creates a reasonable doubt that did not otherwise exist.").

[113] *Ritchie*, 480 U.S. at 57 (quoting *Bagley*, 473 U.S. at 682); *see also Lambert v. State*, 435 P.3d 1011, 1020 (Alaska App. 2018) (explaining that "reasonable probability" is a legal term of art that does not mean "more likely than not"); *Blake*, 63 P.3d at 61 (same).

harmless beyond a reasonable doubt.[114]  All non-disclosed records shall be kept under seal and made part of the record for appellate review.

Following disclosure and adversarial briefing (if any), the superior court shall issue a final order on whether Douglas is entitled to a new trial.  The case will then return to this Court to allow for appellate review of that decision, if requested.

*Conclusion*

This case is REMANDED for further proceedings in accordance with this opinion.  We retain jurisdiction.

---

[114]  *See State v. Peseti*, 65 P.3d 119, 130 (Haw. 2003) ("[T]he denial of a defendant's right to confront adverse witnesses is subject to the harmless-beyond-a-reasonable-doubt standard of review."); *State v. Peeler*, 857 A.2d 808, 846 (Conn. 2004) (concluding that the State established, beyond a reasonable doubt, that the disclosure and use of the defendant's mental health records would not "have had a tendency to influence the judgment of the jury" (quoting *State v. Rolon*, 777 A.2d 604, 617 (Conn. 2001))); *see also Spencer v. State*, 642 P.2d 1371, 1376 (Alaska App. 1982) (applying constitutional standard of harmless beyond a reasonable doubt to an error involving discovery of a witness's psychiatric records held by the State).